In re NATIONAL AEROSPACE,
INC., Debtor.

Gregory K. CREWS, Trustee, Plaintiff,

v.

NATIONAL COATING, INC., Defendant.

Bankruptcy No. 95–2706.
Adversary No. 97–132.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

March 3, 1998.

Sandra C. Kahle, Jacksonville, FL, for Plaintiff.

Lance P. Cohen, Cohen & Thurston, Jacksonville, FL, for Defendant.

Gregory K. Crews, Jacksonville, Fl, Chapter 7 Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This adversary proceeding is before the Court upon the Complaint of Gregory K. Crews, Trustee (Plaintiff), to recover fraudulent or preferential transfers from National Coating, Inc. (Defendant), pursuant to §§ 547 and 548 of the Bankruptcy Code. After a trial on November 25, 1997, the Court enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Vern and Barbara Hampton are husband and wife and were the sole shareholders and officers of National Aerospace, Inc. (Debtor).

2. Barbara Hampton is the sole shareholder and President of National Coating, Inc. (Defendant). Don Canada was President of Defendant for the latter part of 1994 and 1995.

3. On June 9, 1995, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. The case was converted to Chapter 7 on April 29, 1996.

4. Debtor was in the business of fabricating metal products primarily for the Defense Department. To perform its contract with the Defense Department, Debtor had to plate or coat the component parts it manufactured. Defendant was formed to provide coating and plating services for Debtor. Defendant was separately formed because the chemicals and materials utilized by it create fumes and residue which can damage the machines used by Debtor to cut and fabricate parts.

5. Debtor and Defendant shared a close financial relationship. Although, Vern Hampton was not a shareholder, officer, or employee of Defendant, he exercised significant control over its business decisions. In addition, many of the same individuals who signed checks for Defendant also signed checks for Debtor, including Vern Hampton, Barbara Hampton, and Steve Hampton, their son.

6. Periodically, usually weekly and sometimes bi-weekly, Defendant would generate an invoice to Debtor for work completed. Debtor made no payments until Defendant contacted Debtor and requested the funds. When Defendant needed cash for payroll, rent, or payments to suppliers, a request for payment would be made on Debtor. Debtor's accounting records show no direct correlation between the amounts and due dates of

any particular invoices and the payments it made to Defendant.

7. The normal course of dealing of the parties was that large checks would be written to Defendant from Debtor as payment for work completed. Any third party payments made by Defendant on behalf of Debtor were repaid contemporaneously. However, the last contemporaneous repayment that can be identified by the Court is Transfer # 57 on November 18, 1994, for check numbers 2479 and 2483. (Plaintiff's Ex. 3; Defendant's Ex. 5). Beginning in November 1994, payments were written for smaller amounts because third party payments were made by Debtor for Defendant. Large payments were made directly to Defendant for payroll.

8. In January 1995, further changes occurred. Debtor stopped maintaining its general ledger, and both companies began keeping unified records of their daily cash disbursements and receipts in a single, consolidated form labeled "Check Requirements." Other bookkeeping changes included the creation of new accounts and direct wire-transfers of Debtor's receivables to Defendant's bank account.

9. During the twelve months prior to Debtor's bankruptcy filing, Debtor made payments totaling $404,580 directly to Defendant and to third parties on Defendant's behalf. Debtor also made two payments, totaling $21,913, through direct deposit of Debtor's receivables to Defendant's bank account.

10. From June to October 1994, payments were made primarily by check; in November and December 1994, payments were made with a combination of checks and withdrawals from Debtor's savings account. After January 1995, transfers to Defendant were made primarily through withdrawals from a savings account ("180" account). The total amount of transfers paid through the "180" account was $108,221.43.

11. Plaintiff sues Defendant to recover payments made by Debtor to Defendant the year prior to the petition date, alleging that certain payments were fraudulent or prefer-

ential transfers pursuant to 11 U.S.C. §§ 547 and 548.

12. Defendant denies the allegations and asserts affirmative defenses pursuant to § 547(c) of the Bankruptcy Code.

### CONCLUSIONS OF LAW

The issue before the Court is whether Plaintiff can seek to avoid certain transfers made by Debtor to Defendant pursuant to § 547(b) or § 548 of the Bankruptcy Code.

**I. Preferential Transfers Under 11 U.S.C. § 547**

Section 547 of the Bankruptcy Code provides, in relevant part:

(b) [T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor is insolvent;

(4) made—

(B) on or within 90 days before the date of the filing of the petition; or

(C) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (1998).

The parties do not dispute that Debtor's payments to Defendant, totaling $404,580, constitute preferential transfers pursuant to 11 U.S.C. § 547(b). Defendant acknowledges that the payments were made to an insider between ninety days and one year prior to the petition date and on account of

an antecedent debt.[1]  Also, Defendant does not dispute that Debtor was insolvent one-year prior to its bankruptcy filing.  Finally, Defendant admits that it received more money than it would have had Debtor not made the payments and it had received distribution from the estate pursuant to § 726 of the Bankruptcy Code.

Plaintiff argues that the preferential transfers Defendant received from Debtor's "180" account, in the amount of $108,221.43, can be avoided.  Plaintiff also seeks to avoid two wire transfers, in the amount of $21,913, that Defendant received from Debtor's receivables.  In response, Defendant asserts two affirmative defenses:  the ordinary course of business exception of § 547(c)(2) and the new value exception of § 547(c)(4).

## II.  Ordinary Course Of Business Exception Under 11 U.S.C. § 547(c)(2)

The first affirmative defense asserted by Defendant is that the transfers fall within the ordinary course of business exception of § 547(c)(2).  In relevant portion, § 547(c)(2) provides:

> (c) The trustee may not avoid under this section a transfer—
>
> > (2) to the extent that such transfer was—
> >
> > > (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and
> > >
> > > (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> > >
> > > (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2) (1998).

◼ Defendant bears the burden of proving all elements of § 547(c)(2) by a preponderance of the evidence.  *In re Braniff, Inc.*, 154 B.R. 773 (Bankr.M.D.Fla.1993).  The factors to consider when evaluating whether the transferee is entitled to take refuge in § 547(c)(2) are:  (1) the prior course of dealing between the parties;  (2) the amount of the payments;  (3) the timing of the payments;  and (4) the circumstances surrounding the payments.  *Id.*

◼ This Court has previously determined that a subjective inquiry is appropriate for all subsections of § 547(c)(2).  *Grant v. SunTrust Bank, Central Florida, N.A. (In re L. Bee Furniture Co., Inc.)*, 203 B.R. 778, 782 (Bankr.M.D.Fla.1996).  Therefore, in applying the ordinary course of business exception, "[t]he inquiry focuses on analysis of the business practices which were unique to the particular parties involved and not to generally prevailing industry practices."  *Florida Steel Corp. v. Stober (In re Industrial Supply Corp.)*, 127 B.R. 62, 65 (M.D.Fla.1991).

### 1.  *Prior Course of Dealing*

◼ With respect to the payment of invoices, the prior course of dealing of the parties was that Debtor generally did not make a payment until contacted by Defendant.  However, in January 1995, significant changes began to occur, particularly with respect to Debtor's method of payment.  During this period, Debtor stopped using a general ledger, and both companies began to keep a unified record of their daily cash disbursements and receipts.  In addition, Debtor stopped making payments to Defendant from its checking account, opting instead to use the "180" savings account.

Regarding the third-party payments and loans provided to Debtor, it was common for Debtor to contemporaneously repay Defendant.  However, the last identifiable contemporaneous repayment was conducted on November 18, 1994.  During this period, Debtor made contemporaneous repayments of $61,985.10 to Defendant.

The Court finds that the "180" account transfers, in the amount of $108,221.43, were outside the prior course of dealing of the parties.  In addition, the Court finds that the two wire transfers to Defendant of $21,913, originating from Debtor's receivables, were also inconsistent with their normal course of dealing.

---

1.  Defendant claims that it performed services and purchased goods on behalf of Debtor in the amount of $453,431 which were invoiced.  In addition, Defendant claims that it paid or lent money to Debtor, totaling $131,185.59, during the same one-year period.

### 2. *Amounts of the Payments*

The Court finds that the amounts paid from the "180" account, and the amount of the wire transfers, were not radically different from the amounts Debtor had previously paid to Defendant from its checking account.

### 3. *Timing of Payments*

The Court does not find any inconsistencies with respect to the timing of the payments from the "180" account and the wire transfers.

### 4. *Circumstances Surrounding Payment*

■ The Eleventh Circuit has stated that § 547(c)(2) is designed to protect "those payments which do not result from 'unusual' debt collection or payment practices." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir.1986). Plaintiff argues that Debtor's use of the "180" account, and the wire transfers, constituted an unusual payment practice.

The Court finds that Debtor's use of a savings account to make payments to Defendant was unusual. Indeed, it appears to the Court that the use of savings withdrawals, rather than checks, concealed many details of the transactions. Additionally, the wire transfers from Debtor's receivables constituted a radically different form of payment than previously conducted by Debtor.

Therefore, the Court finds that payments made from the "180" account, totaling $108,221.43, and wire transfers in the amount of $21,913, were outside Debtor's and Defendant's prior course of dealing and involved an unusual payment practice. Accordingly, these payments are not be protected under the ordinary course of business exception of § 547(c)(2).

### III. New Value Exception Under 11 U.S.C. § 547(C)(4)

The second affirmative defense asserted by Defendant is that the transfers were made for "new value" pursuant to § 547(c)(4). Section 547(c)(4) provides:

(c)The trustee may not avoid under this section a transfer—

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by any otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ...

11 U.S.C. § 547(c)(4) (1998).

Section 547(a)(2) defines "new value" as:

money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation; ·....

11 U.S.C. § 547(a)(2) (1998).

■ The Eleventh Circuit Court of Appeals has specified that a transfer must meet the following requirements to be afforded protection under § 547(c)(4):

(1) the creditor must have extended the new value after receiving the challenged payments,

(2) the new value must have been unsecured, and

(3) the new value must remain unpaid.

*In re Jet Florida System, Inc.*, 841 F.2d 1082, 1083 (11th Cir.1988).

The Eleventh Circuit found that the purpose of § 547(c)(4) was to uphold the policy considerations intended by Congress: to encourage creditors to continue extending credit to financially troubled entities so as to discourage a panic-stricken race to the bankruptcy court. *Id.* An additional objective of § 547(c)(4) is to "promote equality of treatment among creditors." *Id.*

When new value is extended to a debtor after a creditor receives a preferential transfer, the new value in effect "returns the preference to the estate." *In re Formed Tubes, Inc.*, 46 B.R. 645, 647 (Bankr. E.D.Mich.1985). However, the Eleventh Cir-

cuit has held that to qualify as new value the advances must provide the debtor with a material benefit. *Jet Florida*, 841 F.2d at 1084.

> This focus upon whether a material benefit has been conferred has been explained in terms of insulating a creditor to the extent that that creditor thereafter replenishes the estate. In such a situation, the creditor pool would not be harmed to the extent of the offset and the fundamental goal of equality of distribution would be preserved.

*Id.*

■ Defendant contends that the year prior to Debtor's bankruptcy filing it provided new value to Debtor in the amount of $585,000. Plaintiff argues that payments Defendant received from the "180" savings account, totaling $108,221.43, and the two wire transfers, totaling $21,913, do not qualify for the new value exception, because Defendant failed to show that the new value was provided subsequent to the receipt of each transfer. However, Plaintiff's post-trial submissions to the Court indicate that Defendant did indeed provide some new value to Debtor. Exhibit B of Plaintiff's Post–Trial Memorandum illustrates that Defendant extended new value after receiving several of the challenged "180" account payments. Plaintiff calculated that from January 27, 1995 to the date of filing, Debtor transferred 108,221.43, with Defendant providing new value of $60,555.66. The Court finds no reason to dispute Plaintiff's calculations. Accordingly, Plaintiff cannot avoid preferential transfers of $60,555.66 pursuant to § 547(c)(4).

## IV. Fraudulent Transfers Under 11 U.S.C. § 548

Plaintiff also alleges that the transfers were fraudulent pursuant to § 548(a)(1). Section 548(a)(1) provides:

> (b) The trustee may avoid any transfer of an interest of the debtor in prop-

erty, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

> (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted;
>
> . . .

11 U.S.C. § 548(a)(1) (1998).

■ The Court finds no evidence to support Plaintiff's contention that the transfers were fraudulent. First, Plaintiff acknowledged that for the year prior to Debtor's bankruptcy filing there were legitimate invoices in excess of $341,000. Second, Plaintiff recognized that Debtor contemporaneously repaid Defendant in excess of $60,000 in consideration of the third-party payments Defendant had made on Debtor's behalf. Finally, it was quite common for the Debtor to make payments to Defendant without correlating the amounts and due dates of particular invoices. Thus, it would be difficult for the Court to make a determination that Debtor did not receive reasonable equivalent value for the payments it made to Defendant during the relevant period.[2] Accordingly, the Court concludes that the payments made from the "180" account and the wire transfers were not fraudulent, pursuant to § 548(a)(1).

### CONCLUSION

The Court finds that Debtor made preferential transfers to Defendant from the "180" account, totaling $108,221.44, and wire transfers in the amount of $21,913. Pursuant to 11 U.S.C. § 547(c)(4), Defendant is entitled to setoff the amount of new value it extended to Debtor, totaling $60,555.66. Accordingly, Plaintiff may recover and avoid preferential

---

**2.** The new value exception of § 547(c)(4) requires knowledge of the timing of the transfers, such that Defendant provided new value after receiving the transfers. Although, it appears to the Court that Debtor's normal course of dealing was to not correlate amounts due and owing when making a payment to Defendant, the Court accepted Plaintiff's determination that Defendant provided new value. However, the Court declines to accept those same calculations to conclude that the transfers were fraudulent, because to do so would be detrimental to Defendant.

transfers in the amount of $69,578.77. Plaintiff may not avoid preferential transfers pursuant to 11 U.S.C. § 548(a)(1). The Court will enter a separate judgment consistent with these findings of fact and conclusions of law.