**In re CCG 1355, INC., Debtor.**

**Official Committee of Unsecured Creditors of the Estate of CCG 1355, Inc., Plaintiff,**

v.

**CRST, Inc., Defendant.**

**Bankruptcy No. 99–56547 (MS).**
**Adversary No. 01–5269 TS.**

United States Bankruptcy Court, D. New Jersey.

April 16, 2002.

Carmen M. Banerjee, Markowitz, Gravelle & Schwimmer, Lawrenceville, NJ, for Plaintiff.

Jeffrey Posta, Sterns & Weinroth, P.C., Trenton, NJ, for Defendant.

### OPINION

MORRIS STERN, Bankruptcy Judge.

***Background.***

Plaintiff, the Official Committee of Unsecured Creditors of the Estate of CCG 1355, Inc., ("Committee"), claims in this adversary proceeding that three (3) payments by the aforenamed debtor ("CCG"), to defendant, CRST, Inc. ("CRST"), were voidable transfers subject to recovery pursuant to 11 U.S.C. §§ 547 and 550.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference by the United States District Court of New Jersey dated July 23, 1984. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F).

On March 26, 2002, the court conducted a trial in which the Committee and CRST each produced one witness. The Committee's witness was Mr. Frank Gatti, a financial consultant who had worked for the debtor in a controller/consultant capacity from November, 1998 until April 9, 1999. Mr. Gatti had helped prepare documents for CCG's bankruptcy petition. CRST's witness was Mr. Scott McFarland, an operations/sales manager with 20 years of trucking industry experience, 10 years with another large national trucking company and the last 10 years with CRST.

Plaintiff submitted six and defendant submitted four documentary exhibits at trial, all admitted into evidence and referred to hereinafter.

CCG filed a petition in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code on June 3, 1999. It had been in the business of selling, nationwide, office furniture and related partitions and equipment. CRST, a trucking company, picked up CCG's product and delivered it to CCG customers in the period from April 1995 until some time approaching the petition date in June 1999.

Within the 90 days preceding the petition date (i.e., in the March 5, 1999 to June 3, 1999 period), CCG issued the following checks to the defendant:

Check # 030362, dated 3/5/99, in the amount of $2000.00 (Payment I);

Check # 030470, dated 3/12/99, in the amount of $21,505.60 (Payment II); and

Check # 030529, dated 3/22/99, in the amount of $16,835.00 (Payment III).

The March 5 and March 12 checks identified on their "stubs" the twelve [1] invoices that were being paid. These facts are not disputed. *See* data pertaining to Payments I and II in Appendix 1, noting the dates the checks were received by CRST rather than the CCG issue dates.[2] All

---

**1.** Payment I was made against a portion of CRST's invoice B 556303; the balance of that invoice, $1952.80, was paid as part of Payment II.

**2.** Payment II seems to have been issued and received on the same date. *Compare* Ex. P–1 with Ex. D–1. Note that the dates the checks were honored by the payor bank is not signifi-

invoices paid by Payments I and II were at least 80 days old.

### Payment III: How Was It Applied?

Plaintiff's witness, Mr. Gatti, verified that Payment III, a manual[3] check for $16,835, was issued on March 22, 1999. Defendant's counsel, in his opening, agreed that payment of that amount was made (rather than the $10,785 claimed in pretrial a submission). However, since this check and its stub accounting for its payment of particular invoices could not be produced, the question of how it was applied had to be resolved at trial.

Mr. Gatti testified as to the application of the entire Payment III amount by referring to defendant's proof of claim (Ex. P–6). The witness cobbled together invoice amounts (including collection costs), and roughly approximated the amount of Payment III. In essence, he simply speculated that some $16,893.50 of invoices said to be unpaid by CRST in its proof of claim, were attributable to Payment III. Mr. Gatti conceded he had no specific knowledge of payment application, and that this was just a guess. In fact, Payment III was in a different amount, i.e., $16,835.

Mr. McFarland for CRST was specific. CRST's Ex. D–1 reflects the defendant's business record credit to 10 invoices (all 80 days and older at the time of payment). His testimony also clearly established that the $6050 difference between the credit given by the defendant in its Ex. D–1 (i.e., $10,785) and Payment III's $16,835 total was for certain later-billed March 1999 invoices included in Ex. D–4[4]. The witness

indicated that at some time in March 1999, a representative of CCG had advised him that the company was about to be sold and that payments would cease. CCG needed certain important shipments to be undertaken by CRST, and would pay "in advance." These payments appear to have been made between 7 and 11 days after the shipment dates and 3 to 6 days after the delivery dates, all in advance of the Ex. D 4 invoice dates, and as part of Payment III/the 3/22/99 check (received on 3/23/99 by CRST). (The $6050 portion of it is referred to hereinafter as the "Advance Payments.")

The court finds the McFarland explanation credible, and accordingly attributes the $6050 portion of Payment III per Ex. D–4 and App. 2, with the balance of that payment reflected in Ex. D–1/App. 1.

### Plaintiff's § 547(b) Proofs.

There is little contest about the § 547(b) characteristics of Payments I, II and III. The checks were made payable to CRST ("for the benefit of" CRST in § 547(b)(1) terms). All credits but the Advance Payments were against invoices which were 80 days old and older, with services concluded before the invoice dates, and even the Advance Payments were not transferred until 7 to 11 days following the shipping dates[5] (thus all of Payments I, II and III were "on account of an antecedent debt" per § 547(b)(2)). These transfers occurred both while CCG was insolvent, pursuant to the § 547(f) presumption, and within the 90 day period

---

cant under the circumstances of this case. See Barnhill v. Johnson, 503 U.S. 393, 400–401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

**3.** The more usual CCG checks were machine generated, "automated" checks.

**4.** See App. 1 (last 10 paid invoices totaling $10,785) and App. 2 (reflecting payment of 5

invoices totaling $6050), combined to account for the exact amount of Payment III.

**5.** Debts need not be past due to constitute an antecedent debt for purposes of § 547(b). See In re First Jersey Securities, Inc., 180 F.3d 504, 511 (3d Cir.1999).

preceding the petition date. §§ 547(b)(3) & (4)(A). Moreover, since CCG in Mr. Gatti's terms "was not liquid" in the bankruptcy proceeding nor "capable of paying" CRST or unsecured creditors similarly situated (indeed, CRST's Ex. 3/App. 3 cites invoices which have gone unsatisfied), the § 547(b)(5) test is met by CCG. CRST received 100% satisfaction for invoices paid in March 1999, while distribution in the proceeding in lieu of such payments would have yielded CRST essentially nothing.

Plaintiff has thus carried its § 547(g) burden of proof. Subject to § 547(c), Payments I, II and III would be avoided. *See generally J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir.1989); *In re Parkline Corp.*, 185 B.R. 164 (Bankr.D.N.J.1994).

### Defendant's § 547(c)(2) "Ordinary Course of Business" Defense.

#### § 547(c)(2)(B)—Course of dealing between CCG and CRST.

■ The defendant contends that it has satisfied the requirements of § 547(c)(2)(B), in that the transfers in question were "made in the ordinary course of business or financial affairs of the debtor and the transferee." CCG carries the burden of proving this "ordinary course" requirement. § 547(g).

Within the preference period, exclusive of the Advance Payments, CRST credited CCG with 23 payments against 22 invoices.[6] All of the invoices had aged 80 days or more at the time of payment (as reflected in CRST's records, Ex. D–1). Nine of these payments were against invoices over 90 days old when paid. *See* App. 1 (the court's composite spread sheet reflecting this data as derived from Exs. D–1 and D–2).

The defendant's witness, Mr. McFarland, testified that in 1995 his company could get the debtor's business only by agreeing that payment terms would be in the 60 to 90–day range. (Apparently, no writing memorializes this arrangement, and the witness was candid in saying that he constantly tried to change it to advantage his employer.) The actual course of dealing between the parties shows that the average invoice-to-payment interval in 1995 was 68.11 days, in 1996 was 54.41 days, in 1997 was 59.86 days and in 1998 was 73.44 days. Throughout the entire CCG–CRST business relationship, the average payment interval was 66.47 days. Mr. McFarland confirmed that these averages were based on Ex. D–2. The court calculates (from Ex. D–2) the average in 1999 to be 84.40 days, made up of the average in the preference period of 89.09 days, and in the two months preceding March 1999 of 79.50 days.

Viewed somewhat differently, consideration of the distribution of paid invoice ages, rather than mere averages, gives more insight into the CCG–CRST relationship. *See* Ex. D–2. From the inception of the relationship in mid–1995 through early June 1998 (i.e., the point in time one year prior to the petition filing date and nine months prior to the transfers in question), only 26 payments were made against invoices that had aged 80 days or longer, out of a total of 324 transfers (about 18%). More broadly, Ex. D–2 reflects 432 transactions with invoice dates running from 5/31/95 through 1/1/99, and payments running from 7/27/95 through 3/23/99. Of these 432 payments, only 89 were against invoices which were 80 days old or older (about 21%), 23 of which were in the preference period. Hence, before the preference period, and throughout the totality of the relationship between the debtor and

---

**6.** *See* note 1, *supra,* as to "split" invoice.

the defendant, only 66 of 409 payments (about 16%) were made against invoices which had aged 80 days or more. In the last nine months before the preference period, payments lagged (particularly from mid-June 1998 through the first week of August 1998), with 33 of 77 payments (about 43%) being against 80 day or older invoices. However, in the first two months of 1999 and just prior to the beginning of the 90 day preference period on March 5, the total of 22 paid invoices included only five which had aged 80 days or more (about 23%). Yet all of the preference period payments (but for the Advance Payments [7]) were 80 days or more beyond the invoice dates.[8]

In assessing whether the March 1999 transfers by CCG were "ordinary" when viewing the CCG–CRST course of conduct in its entirety, the court considers, in addition to invoice aging statistics, the following:

(i) Payment III [9] was clearly made with CRST's knowledge of CCG's impending inability to pay, and though Mr. McFarland denies pressuring CCG for payment of old debts when told of the need for the important March shipments, Payment III went substantially beyond the scope of the Advance Payments;

(ii) Payments II and III, $21,505.60 and $16,835 respectively, were each greater in amount than all other CCG check payments reflected in Ex. D–1, and considerably greater than all but two of that

exhibit's 22 payments (those two being $11,040 on 7/13/98 and $12,400 on 8/7/98);

(iii) Payment III was a manual check rather than the more usual automated check (see Ex. P–3); and

(iv) Payment I was a "split" payment, applying $2000 to invoice B 556303 and leaving a balance due of $1952.80, a circumstance said by Mr. McFarland to happen sometimes when shipment circumstances called for partial payment, but the witness was not prepared to say whether this invoice and file reflected such circumstances.

### § 547(c)(2)(C)—the industry standard.

The defendant claims to have satisfied the requirement that the subject transfers were "made according to ordinary business terms." § 547(c)(2)(C). Mr. McFarland, with 20 years experience in the trucking industry (10 with the defendant), testified that 60 to 70 percent of industry payments are made in 60 days or less (including 40 to 50 percent in the 35 to 40 day range). He also testified that 20 to 25 percent of industry customers pay in the 60 to 90–day period. Mr. McFarland indicated that payments within 40 days would have "thrilled" any trucker, who would be "pleased" with such prompt payment. The witness' prior employer, a national trucking company, would send delinquency notices at the 42–day aging point.[10] He of-

---

7. None of the calculations based upon Ex. D–2 includes the Advance Payments.

8. Defendant doesn't offer through testimony any specific evidence justifying as "ordinary" the payment of invoices older than 90 days (i.e., outside the 1995 60–90 day pay arrangement); yet Payment I was against a portion of a 101–day old invoice, Payment II applied to 12 invoices, 5 of which were over 90 days old, and Payment III, covering (exclusive of Ad-

vance Payment) 10 invoices, applied to 3 over 90 days old.

9. Whether Payment II (or even that payment and Payment I) were made after Mr. McFarland was advised by CCG of its impending inability to pay, is unclear; he testified that he was so advised "in March 1999."

10. CRST's invoices included pre-printed terms: "payment must be received within 15 days from bill date or finance charges of 3/4%

fered that an industry substandard for paper transport was 60–day payment terms, while such major enterprises as Kmart and GE could command 90–day terms.

The defense infers that the "ordinary business terms" standard includes the latter portion of the payment period spectrum (i.e., the 20 to 25 percent of shippers stretching payment from 60 to 90 days). Yet there is no direct testimony from Mr. McFarland that transfers beyond the 80–day point remain usual and acceptable and thus in accordance with "ordinary business terms" in the trucking industry. The court is left to guess as to what the distribution of payment is within this 60 to 90 day tier. Do most shipping customers who pay in this tier pay within 70 days? 75 days? Only in the 80 to 90 day bracket? No answer is available in the record (and, in fairness, such statistics might not be readily available). No industry publications were offered, nor anything more than Mr. McFarland's experienced but generalized in-put.

What is clear and essentially uncontested is that over 90–day payment terms are *not* "ordinary business."

### Determination As to § 547(c)(2) Defense.

The court concludes that CRST has not met its burden of proving its "ordinary course" defense to avoidance of Payment I, Payment II and that portion of Payment III ($10,785) exclusive of the Advance Payments. *See* § 547(g).

■ The "ordinary course" determination requires, of course, a "peculiarly factual analysis." *In re Fulghum Constr.*

*Corp.,* 872 F.2d 739, 743 (6th Cir.1989). *See also Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991). "The controlling factor is whether the transactions between the debtor and the creditor, both before and during the ninety-day period, were consistent." *In re Gateway Pacific Corp.,* 153 F.3d 915, 917 (8th Cir. 1998).[11] Thus, late payments can be ordinary course if analysis finds them to be consistent, both before the preference period and during that period. *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1032 (7th Cir.1993). Median time intervals between invoice date and payment date, both before and during the preference period, are logical comparisons in making such an analysis. *In re Gateway Pacific Corp.,* 153 F.3d at 918. Comparison of the "mix" or distribution of payments against old invoices is also relevant. *Ibid.*

■ Though the testimony is that an arrangement was initially made for CCG payment within the 60 to 90 day range, the four-plus year course of dealing between CCG and CRST belies the claim that 80 day and older payments were "usual" or "ordinary." The average invoice date to payment date interval in the preference period (89.50 days) significantly exceeds the overall average for the four-year CCG–CRST business relationship (66.47 days). It is also more than 20% "later" than the average in 1998 (73.44 days), the last full year of that relationship. Even more telling than the comparison of averages, is the comparison of the distribution of 80 day and older interval payments before the last

will be assessed...." Neither CCG nor, apparently, the vast majority of CRST's customers honored these terms. Finance charges were not regularly assessed against CCG.

11. Where the debtor consistently paid the creditor's invoices late before the preference period, but where the tardiness of debtor's payments conspicuously and measurably increased during the preference period, the court found that the unusually late payments during the preference period were not in the ordinary course and held that the creditor had not established the "ordinary course" defense under 11 U.S.C. § 547(c)(2). *Id.* at 917–18.

90 days with that distribution in the preference period. All pre-period measures of every stripe show the mix of payment of 80 day and older invoices in any given time frame to run between 18% and 43%. *The solid block of such payments (i.e., 100%) in the month of March 1999 was unique.* That factor, more than any other, defeats CRST's § 547(c)(2) defense.

The inquiry as to § 547(c)(2) could end with this finding, but other factors and the parsing of the checks by their payment allocations both test and support the numbers-based conclusion. Starting with the 9 payments against 90 day or older invoices, as previously noted, no testimony or argument was offered to establish them as "ordinary course," to satisfy the § 547(c)(2)(B) requirement.

In Payment III, though 7 out of its 10 covered invoices exclusive of Advance Payments were in the 81 to 88 day range, all payments were made with a less usual manual check, which was issued in an amount which well-exceeded the norm. Payment III was proffered following the announcement of CCG's financial distress. It was made, in part, to conclude a deal to encourage CRST to make important deliveries for which CRST was to be paid in advance of the issuance of the Ex. D–4/App. 2 invoices. This was, *per se,* an unusual circumstance in terms of the course of dealing of the parties.

The Advance Payment deal and discussion of CCG's financial distress raise the spectre of creditor pressure or debtor "fawning" in the preference period payment process. *See In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 223 (3d Cir.1994). Though no testimony was offered to show either, and Mr. McFarland denied pressuring CCG, nevertheless, payment of old invoices along with the Advance Payments is very questionable. The absence of an explanation of why $6050 worth of Advance Payments were "bundled" with $10,785 of old invoice payments, undercuts the § 547(c)(2) defense and contributes to the conclusion that CRST has not carried its § 547(g) burden of proof.

Payment I is beyond the pale, being unusual as a partial payment and made against a single 101 day old invoice.

Payment II, covering 11 invoices (including the split invoice), was applied to 5 bills over 90 days old. The remaining 6 paid invoices come closest to the claimed "ordinary course" category; however, Payment II was grossly higher in total amount ($21,505.60) than the usual CCG payments. Whether this check issued after CCG announced its sale and financial distress cannot be determined from the record. But even if CCG had not made the announcement to CRST when CCG issued this out-of-the ordinary size check, it is reasonable to conclude that CCG knew of its status. CCG appears to have favored CRST with this large payment of old invoices. Under these circumstances, application of payment to invoices exclusively 80 days and older (i.e., back to the numbers) is found to be unusual. Therefore, in the final analysis, given the burden of proof which the Bankruptcy Code places on CRST, satisfaction of even these 80 to 90 day old invoices in the context of the March 1999 payments cannot be established as "ordinary course."

Analysis of § 547(c)(2)(C) is not necessary, given CRST's failure to establish its (B) course of dealing requirement. However, examination of the intersection of the (B) and (C) elements of the § 547(c)(2) defense is instructive. *Molded Acoustical,* 18 F.3d at 227, allows for a "customized window" in the industry standard, expanding it for the transferee's benefit when justified by the § 547(c)(2)(B) course of dealing. (That case was heard on a stipulation that the (B) requirement was satisfied.) Such deference to specific historic conduct of commercial parties is roughly

analogous to long-accepted commercial precepts. *See* Uniform Commercial Code, Article 1 Section 205 and Article 2 Section 208 (in New Jersey, N.J.S.A. 12 A. 1–205 [12] & 2–208 [13]).

Here, unlike *Molded Acoustical,* the course of conduct might well be more restrictive than the general industry standard if, indeed, the industry standard were to be accepted as 90–day payment. And while *Molded Acoustical* counsels that the often difficult to establish broader standard can be extended by course of dealing, the Court of Appeals did not imply that the industry standard could extend the more particularized history of dealing between the parties. Therefore, though the McFarland testimony that 20 to 25 percent of shippers pay in the 60 to 90 day range could arguably support payments against invoices in the 80 to 90 day range,[14] that general standard would not impact on or satisfy the (B) requirement. Indeed, the particular debtor-creditor history is the more meaningful determinant of "usual" or "ordinary course" conduct.

## The Advance Payments.

■ The 5 invoices paid in advance of their issue date (Ex. D 4 and App. 2), were made as part of the March 1999 deal between Mr. McFarland and a CCG representative. While there is up to a 12 day lag between the shipment dates (i.e., the dates that goods were first picked up from CCG for later delivery to its customers), and payment, these payments were clearly intended to be contemporaneous with the new shipping services. § 547(c)(1)(A).[15] In fact, payments were made promptly, in both trucking industry terms and per the course of dealing of CCG and CRST. But were they "substantially" contemporaneous with the services rendered? § 547(c)(1)(B). While the five subject shipments were all initiated and delivered somewhat before the March 23 payment, invoicing actually post-dated payment. *See* App. 2. Drawing on the lesson of *Dean v. Davis,* 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), and considering the immediate commercial context, the court

12. N.J.S.A. 12A:1–205(4) provides:

(4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and *course of dealing controls usage of trade.* [Emphasis added.]

13. N.J.S.A. 12A: 2–208(1) & (2) provide:

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such

construction is unreasonable, express terms shall control course of performance and *course of performance shall control both course of dealing and usage of trade* (12A:1–205). [Emphasis added.]

14. Whether McFarland's testimony on this point is too indefinite to render "usual" and "customary" those payments in the 80 to 90 day bracket, need not be decided.

15. *See In re Gateway Pacific Corp.,* 153 F.3d at 918–919, citing *In re Spada,* 903 F.2d 971, 975 (3d Cir.1990). The "intent" requirement of § 547(c)(1)(A) is a question of fact, subject to proofs such as agreement between the parties or course of dealing. *See In re Lewellyn & Co.,* 929 F.2d 424, 427–28 (8th Cir.1991). *Sub judice,* both by agreement and their conduct, the parties intended the March shipments and their payment to be contemporaneous. The services provided by CRST were, beyond question, "new" services appropriately valued at the invoice amounts.

finds these rushed deliveries and Payment III to be substantially contemporaneous.[16] Hence, payment against the App. 2 invoices is not subject to avoidance even though the transfers qualify initially under § 547(b) for avoidance.[17]

### CRST's Subsequent Services.

■ The record reflects that CRST never received any payment for certain invoices. Ex. D3/App. 3 includes 8 invoices which went unpaid. All were dated in the preference period, but only two show shipment dates which would qualify CRST's services as § 547(c)(4) set-offs to preferences.[18] These two invoices are for services first undertaken after, in one instance, Payments I and II, and in another, after all of the voidable payments. CRST thus is entitled to a credit against avoided transfers of $3625. The balance of the eight invoices all reflect shipments initiated before any of the preferential transfers.[19] As such, the six remaining invoices will not support the principal purposes of the "new value" exception and its requirement for advances subsequent to an avoided transfer.[20]

### Judgment For Plaintiff.

■ Plaintiff is awarded a recovery of $30,665.60, comprised of Payment I

16. One line of cases follows a flexible, fact-sensitive approach to determine substantial contemporaneity. *See Pine Top Ins. Co. v. Bank of America Nat'l Trust and Savings Ass'n*, 969 F.2d 321, 328–329 (7th Cir.1992); *In re Marino*, 193 B.R. 907, 913–914 (9th Cir. BAP 1996), *aff'd*, 117 F.3d 1425 (9th Cir. 1997). Relevant circumstances include "length of delay, reason for delay, nature of the transaction, intentions of the parties, possible risk of fraud." *Pine Top Ins. Co.*, 969 F.2d at 328 (3–week delay in transferring collateral following extension of credit deemed substantially contemporaneous when the parties intended contemporaneous exchange, despite delay in processing security documents and absent harm to other creditors); *In re Marino*, 193 B.R. at 915 (14–day delay in recording mortgage following extension of loan deemed substantially contemporaneous when the parties intended contemporaneous exchange and the delay in recording was unavoidable). *See also In re Martella*, 22 B.R. 649, 653 (Bankr.D.Colo.1982) (45 days); *In re Lyon*, 35 B.R. 759, 763 (Bankr.D.Kan. 1982) (20 days); *In re Burnette*, 14 B.R. 795, 803 (Bankr.E.D.Tenn.1981) (20 days). *Distinguish In re Arnett*, 731 F.2d 358, 363 (6th Cir.1984), which applies a strict 10–day boundary adopted from the allowed interval of § 547(e)(2) (which specifically applies to the perfection of security interests). In the case at bar, all services were completed (i.e., deliveries were concluded) within 10 days of the payment date. While thus being "in fact substantially contemporaneous" even under the more restrictive standard, rigid adherence to the 10–day rule would not seem to be necessary in the circumstances of this case.

17. Note also that these transfers would, but for $500 worth of the 3/11/99 shipments, be the basis for set-off to preferences under § 547(c)(4). *Compare* shipment dates and invoice amounts of Ex. D–4/App. 2, with payment dates of App. 1.

18. B 650454, shipment date of 3/15/99 and in the amount of $475, and B 695632, shipment date of 3/26/99 in the amount of $3150, so qualify.

19. Indeed, all six non-qualifying shipments were delivered before any of the avoided preferences. *See* App. 3.

20. "Two policy justifications lie behind [the § 547(c)(4) defense]. First, by limiting the risk of loss incurred by suppliers who continue ordinary credit arrangements with troubled companies, the rule encourages transactions that may allow the debtor to stave off bankruptcy. *Second, the protection provided by the section does not materially harm the other creditors, since the requirement that an advance be followed by an extension of new value insures that any injury to the estate is followed by a subsequent addition to the estate." In re Micro Innovations Corp.*, 185 F.3d, 329, 332 (5th Cir.1999) (emphasis added; citations omitted). *See In re Toyota of Jefferson, Inc.*, 14 F.3d 1088, 1092 (5th Cir. 1994).

($2000), Payment II ($21,505.60), Payment III exclusive of the Advance Payments ($10,785), *less* the new value invoices ($475 and $3150). No pre-judgment interest nor costs or fees are awarded.[21] Plaintiff shall submit a form of Judgment.

## APPENDIX 1 [1]

| DAYS/<br>AGING | INVOICE | INVOICE<br>DATE | AMOUNT | PAYMENT<br>DATE | CK<br>AMOUNT |
|---|---|---|---|---|---|
| 101 | B 556303 | 11/29/98 | 2,000.00 | 03/10/99 | I   2,000.00 |
| 108 | B 553482 | 11/24/98 | 3,952.80 | 03/12/99 | II $21,505.60 |
| 96 | B 563037 | 12/06/98 | 575.00 | | |
| 94 | B 563788 | 12/08/98 | 1,450.00 | | |
| 94 | B 563982 | 12/08/98 | 575.00 | | |
| 89 | B 568277 | 12/13/98 | 875.00 | | |
| 87 | B 569945 | 12/15/98 | 2,550.00 | | |
| 87 | B 570278 | 12/15/98 | 2,425.00 | | |
| 84 | B 574242 | 12/18/98 | 575.00 | | |
| 82 | B 575665 | 12/20/98 | 575.00 | | |
| 82 | B 576058 | 12/20/98 | 2,750.00 | | |
| 80 | B 577100 | 12/22/98 | 3,250.00 | | |
| 101 | B 556303 | 11/29/98 [2] | 1,952.80 | | |
| 93 | B 575302 | 12/20/98 | 100.00 | 03/23/99 | III $16,835.00 [3] |
| 91 | B 576721 | 12/22/98 | 1,000.00 | | |
| 91 | B 576884 | 12/22/98 | 575.00 | | |
| 88 | B 578082 | 12/25/98 | 575.00 | | |
| 86 | B 579562 | 12/27/98 | 2,550.00 | | |
| 84 | B 581163 | 12/29/98 | 2,835.00 | | |
| 84 | B 581334 | 12/29/98 | 950.00 | | |
| 83 | B 582433 | 12/30/98 | 575.00 | | |
| 83 | B 582435 | 12/30/98 | 575.00 | | |
| 81 | B 583344 | 01/01/99 | 1,050.00 | | |
| | | | $34,290.60 [4] | | $40,340.60 [5] |

01-5269TS                                                                 ii

21. Though prejudgment interest, attorney's fees and costs may be awarded under certain circumstances, this judgment, arising from differences asserted in good faith as to unliquidated amounts and questions not readily soluble without judicial intervention, should not include those awards. As to interest, *see In re Armstrong*, 217 B.R. 569, 580 (Bankr. E.D.Ark.1998), *aff'd*, 260 B.R. 454 (E.D.Ark. 2001); as to attorney's fees, *see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); as to costs, *see* FED. R. BANKR.P. 7054(b).

1. This is the court's composite spread-sheet derived from Exs. D–1 and D–2, with adjustments as noted below.

2. *See* same invoice, above; invoice date changed from Ex. D–1 to reflect original date.

3. Ex. D–1 originally stated this amount as $10,785, excluding the Advance Payments. *See* App. 2.

4. Total *excludes* Advance Payments. *See* App. 2.

5. Total *includes* Advance Payments. *See* App. 2.

388

## APPENDIX 2 [6]
### ADVANCE PAYMENTS

| Invoice | Invoice Date | Ship Date | Delivery Date | Payment Date [7] | Amount |
|---|---|---|---|---|---|
| B 651237 | 3/25/99 | 3/16/99 | 3/17/99 | 3/23/99 | $ 850 |
| B 655480 | 3/30/99 | 3/11/99 | 3/19/99 | 3/23/99 | $1250 |
| B 655490 | 3/30/99 | 3/11/99 | 3/19/99 | 3/23/99 | $1250 |
| B 655494 | 3/30/99 | 3/12/99 | 3/20/99 | 3/23/99 | $1350 |
| B 655503 | 3/30/99 | 3/12/99 | 3/19/99 | 3/23/99 | $1350 |
| | | | | | $6050 |

01-5269 TS                                                        iii

## APPENDIX 3 [8]
### OPEN INVOICES DATED WITHIN PREFERENCE PERIOD

| Invoice | Invoice Date | Ship Date | Delivery Date | Amount |
|---|---|---|---|---|
| B 635998 | 3/06/99 | 2/19/99 | 2/20/99 | $ 1100.00 |
| B 638053 | 3/10/99 | 12/5/98 | 12/5/98 | $ 650.00 |
| B 638348 | 3/10/99 | 2/26/99 | 3/1/99 | $ 1462.50 |
| B 645648 | 3/18/99 | 2/26/99 | 3/1/99 | $ 1125.00 |
| B 650454 | 3/24/99 | 3/15/99 | 3/16/99 | $ 475.00 [9] |
| B 651416 | 3/25/99 | 2/26/99 | 3/1/99 | $ 950.00 |
| B 654721 | 3/27/99 | 8/4/98 | 8/6/98 | $ 150.00 |
| B 695632 | 5/19/99 | 3/26/99 | 3/26/99 | $3,150.00 [10] |

6. This is the court's composite spread sheet derived from Ex. D–4.

7. *See* Payment III.

8. This is the court's composite spread sheet derived from Ex. D–3.

9. Credit allowed as a subsequent advance of new value.

10. Credit allowed as a subsequent advance of new value.