**In re NETtel CORPORATION, INC., et al., Debtors.**

**Wendell W. Webster, Trustee, Plaintiff,**

v.

**MicroLink, LLC, Defendant.**

**Bankruptcy No. 00–01771.
Adversary No. 02–10115.**

United States Bankruptcy Court,
District of Columbia.

April 8, 2005.

Jonathon W. Lipshie, Washington, DC, for Debtors.

Linda M. Correia, Webster, Fredrickson, & Brackshaw, Washington, DC, for trustee, Plaintiff.

## DECISION RE MOTIONS FOR SUMMARY JUDGMENT

S. MARTIN TEEL, JR., Bankruptcy Judge.

The plaintiff Webster, trustee of the chapter 7 estate of NETtel Corporation, Inc. ("NETtel"), seeks to recover $124,970.50 in prepetition payments made by NETtel to the defendant MicroLink, LLC as preferential transfers under 11 U.S.C. § 547(b). MicroLink's only defense, as indicated by its pretrial statement, is that the payments come within the exception of 11 U.S.C. § 547(c)(4) to the avoidability of preferential transfers under § 547(b). The parties have both filed motions for summary judgment. The court will reject the argument Webster's motion raises to assert that § 547(c)(4) is inapplicable. The court concludes that MicroLink's motion for summary judgment establishes that subsequent new value was given only to a certain extent, and is deficient for failure to detail proof of part of the elements of § 547(c)(4). However, the court will give the parties the opportunity to supplement their motions to establish the extent to which § 547(c)(4) applies.

### I

These facts are undisputed. In November 1999, NETtel and MicroLink entered into a consulting services agreement pursuant to which MicroLink agreed to provide technology consultants to NETtel.

On July 5, 2000, before any of the preferential payments at issue were made, four of MicroLink's consultants converted to full-time employees of NETtel, triggering $25,000 in placement fees. NETtel never paid MicroLink the $25,000 in agreed-upon placement fees, but the four former consultants remained employees of NETtel throughout the 90–day preference period of § 547(b)(4)(A). MicroLink claims that it thereby conferred value on NETtel throughout the preference period.

After July 5, 2000, NETtel made the four preferential payments at issue. (As will be seen, Webster contends that because the payments were for services rendered prior to the preference period, they do not qualify for application of the § 547(c)(4) exception, but the court concludes that if the new value follows a preferential transfer, § 547(c)(4) setoff of the new value against that transfer is available without the restriction Webster urges.)

On July 6, 2000, MicroLink received a check in the amount of $10,445, the first preferential transfer, paying an invoice for services provided in April 2000.[1] On July 10, 2000, MicroLink received a check in the amount of $9,795 paying an invoice for services provided in January 2000. From July 10 through July 24, 2000, MicroLink provided NETtel $29,975.75 in consulting services (with only $2,694.50 of those services being performed on July 10). So the preferential payments received on July 6 and July 10 and totaling $20,240 were followed by services exceeding the payments.[2]

On July 25, 2000, MicroLink received a check in the amount of $9,795 for services provided in January 2000. From July 25 through August 4, 2000, MicroLink provided NETtel $23,028.50 in consulting services (with only $2,777.25 of those services being performed on July 25). So the $9,795 preferential payment was followed

---

1. For the purposes of § 547(c)(4), the date of transfer is the date of receipt. *Barnhill v. Johnson,* 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

2. Accordingly, it is unnecessary to consider the additional $4,291.50 in consulting services MicroLink provided From July 6 through July 7, 2000.

by new value in excess of the preferential payment.

On August 7, 2000, MicroLink received a check in the amount of $94,935.50 for services provided January 2000 through May 2000. From August 7 through September 21, 2000, MicroLink provided NETtel $62,258.50 in consulting services (with only $2,268.50 of those services being performed on the August 7 date of receipt of the check).

## II

▉ In relevant part, § 547(c)(4) provides that a trustee may not avoid under § 547(b) a transfer

to ... a creditor, to the extent that, after such transfer, such creditor gave new value to ... the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor[.]

Webster's motion rests on an argument, based on *Swallen's, Inc. v. Corken Steel Prods. Co. (In re Swallen's, Inc.)*, 266 B.R. 807 (Bankr.S.D.Ohio 2000), that § 547(c)(4) does not extend to preference payments for prepreference period obligations or to preference payments not made on account of a replenishment of the estate.

To the extent *Swallen's* so held, it is at odds with the plain meaning of the statute. Section 547(c)(4) makes no mention that the preference payments must have been made on account of a replenishment of the estate or that the preference payments not have been on account of prepreference period obligations; the statute requires only that the preferential payments be followed by new value.

Even if the court could disregard that plain language for policy reasons, there would be no reason to do so. Three principal policy considerations animate § 547(c)(4).

First, the statute encourages creditors to extend revolving credit to financially distressed debtors, thus obviating the burden of making payments upfront and allowing many such debtors to avoid bankruptcy. *Crews v. Nat'l Coating, Inc. (In re Nat'l Aerospace, Inc.)*, 219 B.R. 625, 629 (Bankr.M.D.Fla.1998). *Swallen's* leaves creditors uncertain as to whether they may rely on § 547(c)(4) to offset subsequent new value against Webster's recovery, and discourages creditors from extending credit to distressed entities, a result plainly contrary to this first policy consideration.

The second policy underlying § 547(c)(4) is to ensure equal treatment among creditors by recognizing that preferential creditors conferring a postpreference benefit to the estate are essentially returning some portion of the preference to the estate; allowing a trustee to avoid the entire preference would in effect overcompensate the trustee at the expense of the preferential creditor. *Crews*, 219 B.R. at 629. To the extent *Swallen's* allows the trustee fully to recover preferential payments, even where those payments have been partially returned to the estate in the form of subsequent new value, the trustee will be overcompensated at the preferential creditor's expense, thus violating this second policy consideration behind § 547(c)(4)—equal treatment among creditors.

Finally, and most importantly, allowing for setoff under § 547(c)(4) does not run afoul of the basic concept of the preference provisions—which is generally to prohibit the debtor from favoring one creditor over another—because such setoff insulates preferences from avoidance only to the extent that the estate is enhanced by subsequent advances of new value. Thus, de-

claring certain preferences non-avoidable under § 547(c)(4) does not diminish the size of the estate or the theoretical recovery of other creditors. *Official Comm. of Unsecured Creditors v. CRST, Inc. (In re CCG 1355, Inc.)*, 276 B.R. 377, 386 n. 20 (Bankr.D.N.J.2002). Accordingly, the court need not supplement the plain language of the statute to protect nonpreferential creditors: the application of § 547(c)(4) to payments for prepreference period obligations, or to payments not made on account of a replenishment of the estate, does not prejudice other creditors. Because the subsequent new value defense operates only to the extent the creditor has subsequently augmented the estate, disallowing avoidance will not result in a diminution of the res available for distribution.

### III

■ The court next addresses the proper allocation of any new value given NETtel by virtue of the July 5, 2000, conversion of four of MicroLink's consultants into full-time employees of NETtel. MicroLink prorates the $25,000 unpaid placement fees over the preference period, arriving at a per diem value of $294.12. According to MicroLink, at $294.12 per day, the prorated value of the former consultants from August 7 to September 28, 2000, is $15,294.24. The affidavit of David Truitt indicates only that "[t]he total value of the Former Consultants was $25,000 [the aggregate amount of the placement fees]," and the "placement fees were bases [sic] upon 10% of the Former Consultants' annual salaries with MicroLink."

MicroLink has presented no evidence to show that the $25,000 fee was to be earned by MicroLink incrementally over time as the former consultants continued to work. The invoice for the placement fees requested that the $25,000 be remitted, and did not indicate that the $25,000 would be earned over time. The invoice additionally referred to the fees as "Technical Recruiting fees relating to the [four] candidates," thus representing a one-time charge for bringing the employees on board at NETtel. The fees, from an economic perspective, appear to represent a negotiated amount based on what NETtel might have incurred in costs had it on its own solicited, interviewed, and hired four full-time employees, and what MicroLink viewed as fair compensation for losing four consultants who MicroLink itself had originally located and who MicroLink could replace only at some cost to itself. From that perspective, the value provided NETtel by MicroLink, measured by the amount of the placement fees, would have accrued on July 5 when the former consultants were converted to employees of NETtel.[3]

NETtel's right to use the employees' services arose on their becoming employees, and MicroLink lost any right to treat them as consultants so as to be entitled to compensation as they performed future services. MicroLink was thus unlike a lessor who is entitled to rent for future use of the lessor's property: the four consultants were no longer its consultants, and it was entitled to no compensation for NETtel's using their services. Moreover, after July 5, the former consultants were being compensated by NETtel, not MicroLink, and the employees' services cannot be

---

**3.** At least one court considering a placement fee charged in connection with the conversion of a consultant into a full-time employee of the debtor has determined that such a fee does not provide corresponding value to the debtor and thus, even if accrued postpreference, does not constitute new value under § 547(c)(4). *Peltz v. Application Eng'g Group, Inc. (In re Bridge Info. Sys., Inc.)*, 287 B.R. 258, 267 (Bankr.E.D.Mo.2002).

viewed as having been provided by Micro-Link.

True, the placement fees undoubtedly were incurred by NETtel based on the speculative value of the consultants' future services. However, the consultants can be viewed as a labor market commodity (located skilled technicians who were possibly subject to contractual obligations to Micro-Link that might hamper another company's entering into an employment contract with them), with MicroLink selling that commodity to NETtel. That exchange was no different than a purchase of machinery with the expectation of future profits earned from the use of that equipment. A seller, whether of a labor market commodity or machinery, does not confer new value after the sale (except for payment of the sale price) is completed. *See Webster v. Harris Corp. (In re NETtel Corp.)*, 319 B.R. 290, 297 (Bankr.D.D.C. 2004) (when title to equipment passed to debtor on delivery, the debtor's future use of the equipment gave rise to no new value).[4]

The value provided by MicroLink was provided on July 5, 2000, in exchange for the incurring of the placement fees, and does not include the subsequent services actually provided by the former consultants. Accordingly, the court will not, on MicroLink's motion for summary judgment, consider the value of the former consultants after July 5 in the § 547(c)(4) calculus.

## IV

The court next considers the subsequent new value as to which there appears to be no dispute, the postpreference consulting services actually provided by MicroLink. As a preliminary matter, the court will address MicroLink's failure to adduce evidence to establish the elements of § 547(c)(4)(A) and (B) required for the new value to except by like amount the prior preferential payments. Webster has not contended that MicroLink is unable to establish these elements, only that it has failed to do so for purposes of its motion for summary judgment. For reasons discussed below, and in the interest of narrowing the issues for trial, the court will require Webster to report under F.R. Civ. P. 54(d) whether there really is a genuine dispute regarding those elements, and if he does not concede that there is no genuine dispute regarding those elements, the court will allow MircoLink to supplement Truitt's affidavit to establish these two elements of the subsequent new value defense.

### A.

None of the evidence MicroLink has submitted establishes that the consulting services were not secured by an otherwise unavoidable security interest. *See* § 547(c)(4)(A). However, NETtel's schedules of secured debts, executed under pen-

---

4. Even if the future services of the former consultants to which NETtel became entitled conferred new value after July 5, 2000, Micro-Link has not demonstrated that the value ought to be confined to the preference period. If, as MicroLink suggests in its papers, NET-tel's agreement to pay $25,000 was "premised on the Former Consultants joining NETtel's workforce over an extended period of time—not one day," NETtel was entitled to those services for more than just the 85 days of the preference period remaining after July 5,

2000, and was willing to pay the $25,000 in fees based on the prospect of enjoying the services over that much longer period. Mi-croLink cannot carry its burden of proof by prorating the benefit conferred over a period bearing no relationship to the long-term nature of the benefit. *See Webster v. Harris*, 319 B.R. at 296 n. 10 and 297 (lack of evidence of useful life of software license prevented prorating value of software license to determine value of usage during preference period).

alty of perjury, show no security interests held by MicroLink. Under Rule 56(d), it is appropriate to require Webster to advise whether he actually and in good faith controverts that MicroLink received no security interest.

### B.

MicroLink has similarly failed to show that on account of the consulting services that were subsequent new value, NETtel did not make an otherwise unavoidable transfer to or for the benefit of MicroLink. *See* § 547(c)(4)(B). Truitt's affidavit verifies an exhibit summarizing the consulting transactions between MicroLink and NETtel during the 90–day preference period, and that summary shows no transfers other than the ones that Webster has pursued as preferences. That is inadequate to negate the existence of an unavoidable transfer made to MicroLink by NETtel on account of such new value.

For example, if a debtor-in-possession or trustee makes a postpetition payment of a creditor's unpaid prepetition claims pursuant to a "critical vendor" order (as an incentive to continuing postpetition performance by the creditor), that payment would make § 547(c)(4) inapplicable to any prepetition new value if such a "critical vendor" payment were immune from avoidance. However, the court is unaware of any such payments having been authorized. Moreover, Webster's motion for summary judgment includes as an exhibit answers to interrogatories in which Truitt stated that there were no payments to MicroLink other than those set forth in the Balance Detail provided in response to Webster's request for production of documents. Presumably the Balance Detail is the same as the Customer Balance Detail attached as an exhibit to Webster's motion and which Webster says was provided by MicroLink as reflecting the course of invoices and payments between the parties. That evidence would suffice to grant a ruling via summary judgment to MicroLink (unless Webster through other evidence shows the existence of a genuine dispute), that on account of those consulting services that were subsequent new value, NETtel did not make an otherwise unavoidable transfer to or for the benefit of MicroLink.

### C.

■ Assuming that MircroLink is able to establish § 547(c)(4)(A) and (B), the court's § 547(c)(4) analysis is as follows. The court will follow the majority rule, and allow MicroLink to offset new value against all earlier preferential payments, not just those immediately preceding the new value. *Crichton v. Wheeling Nat'l Bank (In re Meredith Manor, Inc.),* 902 F.2d 257 (4th Cir.1990). The July 6 and July 10 payments, totaling $20,240, were followed by consulting services in excess of $20,240. Consequently, the July 6 and July 10 payments are not avoidable by Webster. Similarly, the July 25 payment of $9,795 was followed by consulting services well in excess of $9,795, leaving the July 25 payment non-avoidable in its entirety. Finally, the August 7 payment of $94,935 was followed by consulting services in the amount of $62,258.50 (if work performed on August 7 is included in the calculation) or $59,990 (if work performed on August 7 is excluded from the calculation). Because MicroLink bears the burden of proving the amount of new value conferred subsequent to the receipt of the August 7 payment, and Truitt's affidavit is silent regarding the time of receipt of the August 7 payment versus the time of performance of consulting services on August 7, the court must assume on this record that the check was received after the services were performed. However, MicroLink can supplement its motion in this

regard, as Webster's motion did not contend that MicroLink cannot show that the check was received *prior to* rendition of the services on August 7.

## V

To recapitulate, at this juncture, the court can only grant partial summary judgment decreeing that:

- there were $124,970.50 in preferential payments as described in § 547(b);
- except for the last preferential payment, MicroLink gave new value, in the form of consultant services, after each payment in excess of the preferential payment;
- as to the last preferential payment of $94,935.50, MicroLink gave new value, in the form of consultant services of at least $59,990; and
- if the elements of § 547(c)(4)(A) and (B) are met, then (because the court has rejected in part II the holding in *Swallen's* upon which Webster relies) Webster is entitled to recover no more than $34,945.50 ($94,935.50 less $59,990), less any part of the $2,268.50 of consulting services performed on August 7, 2000, that were performed after MicroLink's receipt on that date of the $94,935.50 check from NETtel.

The remaining issues are thus:

(1) Are the elements of § 547(c)(4)(A) and (B) met with respect to the consulting services rendered after each preferential payment?

(2) Can MicroLink adduce any evidence (or a rebuttal to the court's legal analysis beyond what MicroLink has already argued) to show that any part of the $25,000 in placement fees ought to be treated as new value provided after July 5, 2000?

(3) What portion, if any, of the consulting services of $2,268.50 performed on August 7, 2000, were performed *after* the receipt of the preference payment of that date?

These issues ought to be susceptible of summary judgment, and, based on F.R. Civ. P. 56(d) (permitting the court to determine by inquiry of the parties what issues remain in genuine dispute), a scheduling order follows for the parties to address why, via summary judgment procedures, the record in this adversary proceeding and the main case do not justify a ruling against Webster declaring that § 547(c)(4)(A) and (B) apply with respect to all new value conferred after any preferential payment, and a ruling against MicroLink that Webster is entitled to recover $34,945.50 of the preferential payments (plus costs and prejudgment interest from the date of the filing of the complaint).