**In re A.W. & ASSOCIATES, INC., Debtor.**

**William J. MILLER, Jr. as Trustee for the Estate of A.W. & Associates, Inc., Plaintiff,**

v.

**FLORIDA MINING AND MATERIALS, Defendant.**

**Bankruptcy No. 93–02135.**
**Adv. No. 95–90024.**

United States Bankruptcy Court,
N.D. Florida,
Panama City Division.

March 27, 1996.

William J. Miller, Jr., Tallahassee, FL, for plaintiff.

Louis L. Long, Jr., Tallahassee, FL, for defendant.

William J. Miller, Jr., Trustee, Tallahassee, FL.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS adversary proceeding came on for trial on the complaint of William J. Miller, Jr. as trustee of A.W. & Associates to avoid as a preferential transfer a payment of $6,131.05 made by the debtor to the defendant within ninety (90) days prior to the filing of the bankruptcy petition. The defendant has raised the ordinary course of business exception under 11 U.S.C. § 547(c)(2) as an affirmative defense.

#### Findings of Fact

This bankruptcy case was commenced as a Chapter 11 case on May 3, 1993 and was subsequently converted to Chapter 7 on March 9, 1994. The debtor is a construction company which from time to time purchased concrete materials on an open account from the defendant. The transaction at issue in this case involved a check dated February 25, 1993 in the amount of $6,131.05 issued by the debtor to the defendant in payment for the following five invoices:

| Invoice No. | Date of Invoice | Amount Due |
| --- | --- | --- |
| 850129 | January 29, 1993 | $2,626.29 |
| 850592 | February 1, 1993 | 2,357.75 |
| 851054 | February 2, 1993 | 489.90 |
| 851511 | February 3, 1993 | 412.16 |
| 851981 | February 4, 1993 | 244.95 |

The check was initially presented for payment on March 5, 1993 and was dishonored by the bank. It was resubmitted and honored on March 10, 1993.

Prior to the ninety (90) day preference period, the debtor and defendant had done business with each other on various construction projects within the State of Florida. The defendant maintained separate accounts for each project and the accounts were maintained by the defendant at different offices

depending on the location of the project. The payment terms for each project were determined by the office handling the account. The standard payment terms of the defendant are set forth on the back of each invoice which provides "terms, unless otherwise agreed, are net thirty days, no discounts, no retainage." Any deviation from the standard terms would be reflected on the face of the invoice in a box labeled "terms." According to the testimony of Kay Boosa, Credit Manager for the Panama City district office of the defendant, it was common practice for terms to vary from the standard terms set forth on the back of the invoice.

The payment terms as reflected on the face of the invoices for projects prior to the transaction at issue in this case were "2% 10th net 30 days." Ms. Boosa testified that this meant that there would be a two percent discount if the invoice was paid by the tenth day of the month following the month of delivery and the payment would be past due after the 30th day of the month following the month of delivery. Therefore, for example, payment for a delivery made in December would be past due after January 30th.

Billings on those accounts were handled from the Panama City district office. When the project at issue began, a new account was opened for the debtor at the defendant's Tampa office. The payment terms on this account as reflected on the face of the invoices was "due 10th of the following." The testimony of Ms. Boosa established that these terms meant that payment was due on the tenth of the month following the month of the deliveries. Thus, with respect to the invoices covered by the payment which the trustee seeks to avoid in this proceeding, the first invoice dated January 29, 1993 in the amount of $2,626.29 was due on February 10th, and payment for the remaining invoices was due on March 10th.

Prior to the ninety (90) day preference period, the debtor had established a track record of late payments to the defendant. During the period between April 27, 1992 and January 29, 1993, the debtor was invoiced by defendant for 61 deliveries. Of those 61 invoices, only 13 were paid on time. Of the 48 invoices paid late, 29 were paid more than thirty (30) days after the due date, and 27 were paid sixty (60) or more days late. Many of the late invoices were late because they were paid in "batches" whereby multiple invoices were batched together and paid by a single check. By doing so, some of the invoices being paid would be on time while others were after the due date. Notwithstanding the lateness of payment on many of the invoices, the defendant continued to make deliveries to the debtor, even while payments were outstanding and late.

In addition to the history of late payments, and the practice of "batching" invoices, on several occasions payment checks by the debtor had been returned for nonsufficient funds. When this happened, the defendant routinely resubmitted the checks without taking any extraordinary collection actions or suspending deliveries to the debtor.

### *Conclusions of Law*

Section 547(b) of the Bankruptcy Code (11 U.S.C. § 547(b)) provides that:

547(b). Except as provided in subsection (c) of this section, the trustee may avoid any transfer of any interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In this case, the defendant does not dispute the existence of the elements of a preferential transfer as set forth in § 547(b). The defendant has asserted, however, that it is entitled to rely on the affirmative defense of the ordinary course of business exception of § 547(c)(2) which provides:

> 547(c) The trustee may not avoid under this section a transfer—

> ● ● ●

> (2). [t]o the extent that such transfer was—

>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

>> (C) made according to ordinary business terms.

In this case, I must decide whether the resubmission of a dishonored check takes the payment out of the ordinary course of business, and whether the payment in this case satisfies the ordinary course of business as practiced between the parties.

▮ Initially, a determination must be made as to what the date of payment was in this case. Ordinarily, where payment is made by a check, such payment is deemed to have been made, for the purposes of § 547(c)(2), on the date the check was delivered to the recipient, so long as the check is honored upon its initial presentation to the bank. *In re Downs*, 65 B.R. 1 (Bankr. E.D.Tenn.1985); *see also In re American International Airways, Inc.*, 68 B.R. 326 (Bankr.E.D.Pa.1986). If the check is not honored upon its initial presentment, and subsequently resubmitted, the date of delivery no longer controls and the date of payment becomes the date the check is actually honored by the drawee bank. This conclusion is in accord with the *Florida Uniform Commercial Code*. Section 673.3101, *Florida Statutes* provides that:

> (2) Unless otherwise agreed and except as provided in subsection (1), if a note or an uncertified check is taken for an obligation,

the obligation is suspended to the same extent the obligation would be discharged in an amount of money equal to the amount of the instrument or taken, and the following rules apply:

> (a) in the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.

Thus, the payment by an uncertified check is treated as a cash payment so long as the check is honored when initially presented. The obligation is suspended upon delivery of the check and is discharged to the extent of the amount of the check upon honor. However, if the check is dishonored, then the obligation is no longer suspended and it is discharged only upon honor by the drawee bank. In this case, since the check was initially dishonored, then the date of payment of the invoices is March 10, 1993, the date of honor by the bank.

The foregoing analysis in determining the date of payment for purposes of analyzing the ordinary course of business exception under § 547(c) should not be confused with the Supreme Court's analysis of the date of payment by check in *Barnhill v. Johnson*, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992). There, the court determined that for purposes of establishing the date of a transfer as applied to calculating the ninety (90) day period under § 547(b) the transfer would have been deemed to occur when the check was honored by the bank. The court in *Barnhill* recognized the difference between the date of transfer for purposes of § 547(b) and date of payment for purposes of the exceptions under § 547(c), and the court noted that all courts of appeal considering the issue have concluded that the date of delivery of the check would control the date of payment. *Id.*, at 402, 112 S.Ct. at 1391, 118 L.Ed.2d at 48, n. 9.

▮ In order to prevail under the ordinary course of business defense, the defendant has the burden of establishing that the debt was incurred and the payment was received in the ordinary course of business. *In re Homes of Port Charlotte, Florida, Inc.*,

109 B.R. 489 (Bankr.M.D.Fla.1990). In this case, there is no question that the debt itself was incurred in the ordinary course of business. The debtor in connection with its construction business purchased concrete which defendant sold as part of its business.

■ In assessing the issue of whether the payments were made within the ordinary course of business, courts apply what is known as the vertical dimension test as articulated in *In re Johns–Manville Corp.*, 60 B.R. 612 (Bankr.S.D.N.Y.1986). The inquiry is focused upon the debtor's internal operations and the circumstances of the transactions in question, not industry standards. *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563 (11th Cir.1986) (concluding that a determination about the ordinary course of business necessarily turns on "the specific events surrounding" the payments in question). Four factors are considered: i) the prior course of dealings between the parties; ii) the amount of the payments; iii) the timing of the payments; and iv) circumstances surrounding the payments. *See In re Braniff Inc.*, 154 B.R. 773, 780 (Bankr. M.D.Fla.1993).

In applying the vertical dimension test, this court must track closely the determinations of the Eleventh Circuit Court of Appeals in *Craig Oil,* where the clearly articulated Congressional intent underlying the ordinary course of business exception was reviewed:

> its purpose is to leave to leave undisturbed normal financial relations, because [such an exception] does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditor during the debtor's slide into bankruptcy.

*Craig Oil,* 785 F.2d at 1566 (*citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 6329). The Eleventh Circuit explained that:

> ... 547(c)(2) should protect those payments which do not result from 'unusual' debt collection or payment practices. To the extent an otherwise 'normal' payment occurs in response to such practices, it is without the scope of Section 547(c)(2).

Thus, whenever the bankruptcy court receives evidence of unusual collection efforts, it must consider whether the debtor's payment was in fact a response to those efforts.

*Id.* at 1566.

■ The Trustee has argued that the submission of a dishonored check is per se an extraordinary and unusual debt collection effort which forces the payment outside of the ordinary course of business. This court declines to establish such a rule. The characterization of "any resubmission" as an extraordinary or unusual debt collection practice would ignore the attendant facts and circumstances of the case being considered, and such a rule would be clearly contradictory to the policy of § 547(c)(2) elucidated in *In re Craig Oil.*

■ The Trustee has also asserted that the amount of the March 10 payment attributable to the January 29 invoice should be avoided because it was overdue as of February 10. As a result, the Trustee concludes, the delinquent payment of $2,626.29 made on March 10 falls outside the ordinary course of business. Lateness is a particularly relevant consideration where the ordinary course of business exception is concerned. *Id.* at 1567. In *Empire Pipe,* the court stated:

> ... even if the payments were not made pursuant to the requirements of the invoices submitted, i.e., when payment became due, it still would be accepted as a payment in the ordinary course of business if such payments were generally always past the due date over the years and there was no radical change in the method of collection.

*In re Empire Pipe,* 152 B.R. at 1012, 1014 (Bankr.M.D.Fla.1993). Similarly, in *In re Braniff, Inc.,* the same court noted that "[a] creditor may overcome the presumption that late payments are non-ordinary by showing that it was the ordinary course of the parties business to pay late." *In re Braniff, Inc.,* 154 B.R. at 780.

■ As demonstrated by the evidence submitted, the Debtor was typically late paying its obligations, most often by 60 days or more. The March 10, 1993 payment was 30

days overdue for the January 29, 1993 invoice. Significantly, of the $6,131.05 covered by the March 10 payment, $3,404.76 was attributable to the February invoices and was paid on time. *See Craig Oil* at 1567–8 (noting that the surrounding circumstances of a § 547(c) exception must take into account the significant determination of whether the payments were late). Additionally, the practice of the parties was to permit batch payments, which typically resulted in late reimbursements for outstanding invoices. The March 10 payment was a continuation of this practice at the Tampa district office. Therefore, I find that the late payment on behalf of the January 29 invoice was properly within the parameters of the ordinary course of business established by the parties.

■ The court must also consider the terms of the payment under § 547(c)(2)(C). The Trustee has pointed to the terms for payment, "due 10th of the following month" and taken the position that the ordinary business terms between the parties were "2% 10th net 30 days." The Trustee has asserted that the new, more restrictive payment terms set up by the Tampa district office deviate from the ordinary business terms between the parties, that the change in terms qualifies as an extraordinary debt collection practice, and that the March 10, 1993 payment by the Debtor was a transfer prompted by the extraordinary debt collection practice. I decline to hold that the change in credit terms by itself is dispositive, and under the guidelines of *Craig Oil* I find that the new terms did not deviate from the ordinary course of business between the parties.

■ In *Barnhill,* the Supreme Court observed that § 547(c) was enacted to encourage creditors to continue to deal with troubled debtors on normal business terms "by obviating any worry that a subsequent bankruptcy filing might require the creditor to disgorge as a preference an earlier received payment." *Barnhill,* 503 U.S. at 402, 112 S.Ct. at 1391, 118 L.Ed.2d at 48, n. 9. A creditor may deviate from ordinary business terms by demanding that a debtor submit cashier's checks as payment for future obligations. *See Craig Oil,* at 1565. Alternatively, a creditor may alter the ordinary

business terms by refusing to deliver new merchandise until the balance owed is reduced or completely remitted. As a general proposition, to the extent an otherwise "normal" payment occurs in response to such practices, it is outside the scope of § 547(c) exceptions. *Craig Oil,* at 1566.

■ Nevertheless, the circumstances here demonstrate that the change in payment terms to "due 10th of the following month" was not an extraordinary debt collection practice and that the March 10, 1993 payment was in fact made according to ordinary business terms. The payment date was established pursuant to a new construction job contracted by the Debtor. The Tampa district office set up the supply contract without regard for existing overdue obligations at the Panama City district office, that is, the terms were not set as a means of expediting overdue payments owed to the Defendant at other district offices. In her testimony Ms. Boosa disclosed that she had telephoned the Debtor only once, prior commencement of the Tampa district office deliveries, to inquire about the status of overdue obligations.

Over the course of the relationship, the Defendant consistently shipped newly ordered materials to the Debtor, regardless of status of the overdue payments at the Panama City office. Shipments were made from the Orlando district office in November 1992 without regard to the delinquent status of the Panama City accounts. In this instance, the Tampa district office commenced shipments to the Debtor notwithstanding the status of overdue accounts at the Panama City district office. Furthermore, the Defendant continued to make deliveries while its own account was overdue. The January 29th payment was past due as of February 10, 1993. Nevertheless, the Defendant made deliveries on February 19, 1993, before the insufficient funds check was written, and on February 25 and March 3, before the payment for the overdue January 29 invoice was honored by the bank. (*See* Exhibit 3).

Given the surrounding facts and circumstances, the March 10, 1993 payment was made according to ordinary business terms. The change in payment terms to "due 10th of

the following month" was not intended or enforced contrary to the policy of § 547(c), and the creditor did not encourage the debtor's slide into bankruptcy through revised payment terms and extraordinary collection practices.

### *Conclusion*

Based on the foregoing, I find that the March 10, 1993 payment of behalf of the January and February invoices was made within the ordinary course of business. The payment was not received as a result of extraordinary collection efforts. Accordingly, the transfer is excepted from avoidance under § 547(c)(2) of the Bankruptcy Code. A separate order shall be entered in accordance with this opinion.