**In re MOLTECH POWER SYSTEMS, INC., n/k/a Battery Park Industries, Inc., Debtor.**

**Moltech Power Systems, Inc., n/k/a Battery Park Industries, Inc., Plaintiff,**

v.

**Tooh Dineh Industries, Inc., Defendant.**

Bankruptcy No. 01–00335–LMK.

Adversary No. 03–90048–LMK.

United States Bankruptcy Court, N.D. Florida, Gainesville Division.

June 27, 2005.

Stephen R. Leslie, Tampa, FL, for Debtor.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

LEWIS M. KILLIAN, JR., Bankruptcy Judge.

THIS MATTER came before the Court for hearing on May 5, 2005, upon the Motion for Summary Judgment filed by Plaintiff Moltech Power Systems ("Moltech"), the debtor-in-possession in the Chapter 11 case. Moltech seeks to avoid as preferences certain payments it made to creditor Tooh Dineh. 11 U.S.C. § 547(b). Tooh Dineh claims these payments cannot be avoided because they were made within the ordinary course of business. 11 U.S.C. § 547(c)(2). This Court has jurisdiction under 28 U.S.C. § 1334, and this is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

### FACTS

Tooh Dineh and Moltech started doing business together in August, 1999. As Moltech's supplier, Tooh Dineh procured electronic components and assembled electronic modules, which Moltech then used to manufacture batteries. The parties continued conducting business together until the end of April, 2001. On May 23, 2001, Moltech filed its Chapter 11 bankruptcy petition.

The uncontroverted facts upon which this opinion is based are reflected in the spreadsheet of payments and invoices provided by Tooh Dineh. According to this payment history, the amount of Moltech's payments to Tooh Dineh in the time before the preference period averaged $15,097, and ranged between $90 and $77,768; over 85% of Moltech's payments to Tooh Dineh were for less than $25,000. These payments were made an average of 47 days after the date of invoice, ranging between 26 and 109 days. 82% of the payments Moltech made to Tooh Dineh were made within 60 days. In addition, Moltech made payments to Tooh Dineh in "batches" (where more than one invoice is paid with one check) throughout the course of their business relationship. Before the preference period, average batch size was about three invoices and ranged from 1–10; 82% of payments had a batch size of three or less.

During the 90 days preceding the date of filing of the bankruptcy petition, Moltech made three payments to Tooh Dineh totaling $148,323.62. Moltech concedes that, after crediting Tooh Dineh for the amount subject to the contemporaneous exchange defense and the amount for new value, the amount of net preferences is $82,474. Moltech now seeks to avoid these payments as preferences under § 547(b). 11 U.S.C. § 547(b). In response, Tooh Dineh asserts the affirmative defense of § 547(c)(2), arguing that the payments were made in the "ordinary course of business." 11 U.S.C. § 547(c)(2). The issue is whether the challenged payments were in fact made in the ordinary course of business. For the reasons set forth herein, the motion for summary judgment will be granted because I find the challenged payments were not made in the ordinary course of business and, therefore, may be avoided.

## DISCUSSION

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Bankr.P. 7056(c) (making Fed. R.Civ.P. 56 applicable in bankruptcy cases). No genuine issues of material fact remain unresolved in this case. "In reviewing a motion for summary judgment, the court must consider all the evidence in the light most favorable to the non-movant." *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). Thus, the court will view the evidence in a light most favorable to non-movant Tooh Dineh. Accordingly, this court will rely upon the payment history chart provided by Tooh Dineh which represents the amount and date of all invoices and which has been attached as an appendix to this opinion.

■ The trustee or debtor-in-possession may avoid any transfer of property made to or for the benefit of a non-insider creditor within 90 days of filing for bankruptcy if the transfer was made while the Debtor was insolvent, on account of an antecedent debt, and enables the creditor to receive more than it would have in Chapter 7 liquidation. 11 U.S.C. §§ 547(b) and 1107. The purposes of the preference avoidance provision are to facilitate the policy of equal distribution among creditors and to frustrate extraordinary transactions which cause a race to the courthouse, inevitably resulting in dismemberment of the debtor. *In re Marino*, 193 B.R. 907 (9th Cir. BAP 1996). The parties do not dispute that the three challenged payments of March 5, 2001, March 22, 2001, and April 9, 2001 are preferential under § 547(b). However, the parties disagree as to whether these payments fall within the "ordinary course of business" exception. 11 U.S.C. § 547(c)(2).

■ Section 547(c)(2) provides an affirmative defense to creditors that receive payments which would otherwise be voidable preferences if those payments were made in the ordinary course of business. The burden is on creditor Tooh Dineh to establish this defense. *In re A.W. & Associates, Inc.*, 136 F.3d 1439, 1441 (11th Cir. 1998). The ordinary course of business exception has competing, yet complementary, objectives to the preference avoidance provision. In contrast to the provision allowing avoidance of preferences, the purpose of the ordinary course of business exception is to protect the normal, ordinary relationship between debtors and creditors engaged in recurring credit transactions. This exception was created to encourage creditors to continue to deal with troubled debtors without fear of having to disgorge payments, thus stalling bankruptcy and enabling the debtor to continue in business as a going concern, if appropriate. *In re Issac Leaseco*, 389 F.3d 1205 (11th Cir.2004); *In re Molded Acoustical Products, Inc.*, 18 F.3d 217 (3rd Cir.1994); *In re Furrs Supermarkets, Inc.*, 296 B.R. 33, 39 (Bankr.D.N.M.2003).

■ In order to find refuge in the ordinary course of business safe harbor, the creditor must prove: the debt was incurred by the debtor in the ordinary course of business; the payment was made in the ordinary course of business of the debtor; and, the transfer was made according to ordinary business terms. 11 U.S.C. §§ 547(c)(2)(A)-(C). This is a conjunctive test requiring the court to evaluate both the subjective business relationship as it existed between the parties, as well as objective industry standards in order to determine whether a given transaction was "ordinary." *In re A.W. & Associ-*

ates, Inc., 136 F.3d 1439, 1442 (11th Cir. 1998).

The parties do not dispute that Moltech incurred the debt underlying the challenged payments in its ordinary course of business, so § 547(c)(2)(A) is satisfied. The parties disagree as to whether the other two prongs of the ordinary course of business test have been met; that is, whether the payments were consistent with the subjective course of dealings that existed between the parties (as required by § 547(c)(2)(B)), and whether the payments were made according to objective industry standards (as required by § 547(c)(2)(C)).

The subjective, or vertical, prong of the ordinary course of business test evaluates the relationship that existed between the parties themselves and is a fact-intensive inquiry by nature. Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir.1991); See In re A.W. & Associates, Inc., 136 F.3d 1439, 1441–42 (11th Cir.1998); In re Furrs Supermarkets, Inc., 296 B.R. 33 (Bankr.D.N.M.2003). In essence, whether a given transaction was within the subjective ordinary course of business that had developed between the parties is a broad, fact-based inquiry requiring historic examination of the parties' pre-preference period relations. These past relations are then compared to the subsequent business practices that occurred during the preference period to determine whether they were consistent with each other. In short, the question is whether the parties altered their credit arrangement. See In re Issac Leaseco, 389 F.3d 1205, 1210 (11th Cir.2004).

Under the subjective prong (§ 547(c)(2)(B)), the court will evaluate the parties' prior course of dealings, the amount of payments, the timing of payments, and the circumstances surrounding the payment. In re L. Bee Furniture Co.,

206 B.R. 989, (Bankr.M.D.Fla.1997); In re Empire Pipe and Development, Inc., 152 B.R. 1012 (Bankr.M.D.Fla.1993); In re Speco Corp., 218 B.R. 390 (Bankr.S.D.Ohio 1998). Stated more formally, the court will consider (among other factors): (1) the length of time the parties were engaged in the transaction in issue; (2) whether the amount or form of tender differed from past practices; (3) whether the debtor or creditor engaged in any unusual collection or payment activity; and (4) the circumstances under which the payment was made. In re Johns–Manville Corp., 60 B.R. 612 (Bankr.S.D.N.Y.1986); In re A.W. & Associates, Inc., 196 B.R. 900 (Bankr.N.D.Fla.1996), rev'd on other grounds 136 F.3d 1439 (11th Cir.1998); In re Homes of Port Charlotte, 109 B.R. 489 (Bankr.M.D.Fla.1990) (citing In re Websco, Inc., 92 B.R. 1 (Bankr.D.Me.1988)); In re Furrs Supermarkets, Inc., 296 B.R. 33, 40–41 (Bankr.D.N.M.2003) (noting that some courts use a different fourth factor, which is, "whether the creditor took advantage of the debtor's deteriorating financial condition").

Thus, the court will examine the pre-preference period business practice that existed between the parties in order to establish the ordinary course of business. After the ordinary course of business has been established, the transactions during the preference period are compared to determine whether they were made in a similar manner. In re Empire Pipe and Development, 152 B.R. 1012 (Bankr. M.D.Fla.1993). The relations of the debtor and creditor are placed in a vacuum, and then the transfer in question is scrutinized for anything unusual or different from those relations. In re Furrs Supermarkets, Inc., 296 B.R. at 40–41. Though the entire course of dealing should be considered, some courts have indicated that the pre-preference baseline should be es-

tablished by focusing on a period well before the debtor started experiencing financial problems. *Id.* In addition, some courts have indicated that the ordinary course of business exception should be narrowly construed. *In re M & L Business Machine Co., Inc.,* 84 F.3d 1330, 1339 (10th Cir.1996); *In re Furrs Supermarkets, Inc.,* 296 B.R. at 41;

Courts have several mathematical tools at their disposal for establishing the ordinary course of business and comparing pre-preference transactions with preference period transactions. Most courts tend to use the range of terms that define the transaction, rather than considering only averages. *In re Speco Corp.,* 218 B.R. 390, 399 (Bankr.S.D.Ohio 1998); *See In re Furrs Supermarkets, Inc.,* 296 B.R. at 44 (discussing the virtues of ranges over averages when analyzing whether the third, objective prong of the ordinary course of business exception had been met). These courts have stated that averages alone can be misleading because they do not take into account seasonal variations and other considerations, resulting in inaccurate depictions of what the ordinary course of business actually was. *In re Speco Corp.,* 218 B.R. at 399. However, use of range alone is not always appropriate, and averages are often taken into account as well. *See In re Speco Corp.,* 218 B.R. at 399; *In re Tennessee Valley Steel Corp.,* 203 B.R. 949, 955 (Bankr. E.D.Tenn.1996); *In re National Enterprises, Inc.,* 172 B.R. 829, 832–33 (Bankr. E.D.Va.1994); *In re CCG 1355, Inc.,* 276 B.R. 377, 383 (Bankr.D.N.J.2002); *See also In re Global Tissue,* 106 Fed.Appx. 99 (3rd Cir.2004) (criticizing averages, nonetheless).

■ It must be noted, however, that analysis by range under the subjective prong (§ 547(c)(2)(B)) is different from analysis by range under the objective prong (§ 547(c)(2)(C)). Under the subjective prong of the ordinary course of business analysis, ranges should not be viewed in terms of absolute numbers between which the challenged preference period payments must fall. Rather, the range established before the preference period should be comparable to the range of payment terms during the preference period on *both* the low and high end to ensure that the range is not skewed by aberrational transactions. This is because common sense would seem to indicate that the court should be hesitant to embrace analysis by range when so doing would incorporate aberrations that artificially widen the range, thus presenting an inaccurate portrait of the actual ordinary course of business between the parties. *See In re Speco Corp.,* 218 B.R. 390, 399 (Bankr.S.D.Ohio 1998).

■ Use of percentages in analysis, by the nature of the calculation itself, takes into account aberrations and variations that are skewed by use of ranges or averages. By evaluating the percentage that certain types of transactions took place between the parties, a more accurate depiction of the actual business relationship may be gleaned since the use of percentages automatically represents the degree to which such transactions were recurring.

■ Thus, there is no single mathematical formula the court must use. *In re Daedalean, Inc.,* 193 B.R. 204 (Bankr. D.Md.1996); *See also Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497–98 (8th Cir.1991). Instead, the court may use any or all of these mathematical methods as tools by which to determine what the ordinary course of business between the parties actually was. Nevertheless, courts have provided some guidance for establishing the ordinary course of business between the parties. For example, *Lovett* determined that, when certain business

terms are adhered to only 21% of the time before the preference period, they are not ordinary. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 499 (8th Cir.1991). Aberrational transactions should not define the ordinary course of business.

■ Once the ordinary course of business has been established, the question becomes how much preference period transfers must differ from pre-preference transactions before they become extraordinary. Courts have found that some consistency with the pre-preference period is necessary in order for the challenged payments to be held within the ordinary course of business. *Lovett* at 497–98 (finding that "substantial and significant delays in paying the bulk of invoices" during both the pre-preference and preference periods provided the requisite consistency). The *Speco* court determined that, when the creditor and debtor engaged in certain transactions on 21 separate occasions prior to the preference period, then similar transactions made during the preference period are within the ordinary course of business. *In re Speco Corp.*, 218 B.R. 390, 398–99 (Bankr.S.D.Ohio 1998). *Graphic Productions* concluded that a challenged preference period payment made 84 days after the invoice date is within the ordinary course of business when pre-preference payments ranged from 64–148 days from invoice date and the average payment was 86 days from the invoice date. *In re Graphic Productions*, 176 B.R. 65, 70 (Bankr.S.D.Fla.1994). *Julien* held that a *slight* change of three to four days in the average number of days for payment does not take a transaction out of the ordinary course of business. *In re Julien Co.*, 157 B.R. 834, 841–42 (Bankr.W.D.Tenn.1993) (emphasis added).

On the other hand, a lack of consistency between pre-preference and preference period transactions indicates that the latter were not made within the ordinary course of business. Courts have found that preference period transactions are not within the ordinary course of business when they substantially deviate from pre-preference period transactions. *See In re Tennessee Chemical*, 112 F.3d 234, 238 (6th Cir.1997). In *Homes of Port Charlotte*, there were *generally* 28–76 days between invoice and payment before the preference period; the court found an increase to 63–109 days during the preference period to be "clearly" outside the ordinary course of business. *In re Homes of Port Charlotte*, 109 B.R. 489, 490–91 (Bankr.M.D.Fla.1990) (emphasis added). *Molded Acoustical Products* held that an increase in the average number of days between invoice and payment from 58 before the preference period to 89 during the preference period is outside the ordinary course of business. *In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 228 (3rd Cir.1994). In *CCG 1355*, the court determined that the challenged payments were outside the ordinary course of business because all of the preference period payments were made later than 80 days after invoice, yet the average number of days between invoice and payment throughout the entire business relationship was 66.47, and only 16% of the pre-preference period payments were older than 80 days. *In re CCG 1355, Inc.*, 276 B.R. 377, 381–82, 384 (Bankr.D.N.J.2002). The court found the jump in the average interval between invoice and payment from 66.47 to 89.5 (a difference of about 23 days) to be outside of the ordinary course of business. *Id.* at 382–84. The court buttressed its conclusion by noting that the challenged payments were considerably greater in amount than all but two of the pre-preference payments. *Id.* at 382, 384. With these guidelines in mind, I now turn to the transactions at issue in this case.

■ In evaluating the ordinary course of business defense, the first factor is the length of time the parties were engaged in the transaction at issue. The business relationship between Moltech and Tooh Dineh lasted from August, 1999 to April, 2001 (approximately 20 months). The pre-preference period lasted for 17 months, from August 13, 1999 (the date of the first invoice) to February 23, 2001 (90 days before the petition for bankruptcy was filed on May 23, 2001). This 17–month period establishes the ordinary course of business between the parties under § 547(c)(2)(B). During this pre-preference period, Moltech made 22 payments on 60 invoices to Tooh Dineh.

The second factor is whether the amount or form of tender differed from past practices. Before the preference period, over 85% of Moltech's payments were for an amount less than $25,000. The average payment amount during this time period was $15,097. The payment amounts ranged from $90—$77,768; however, reliance on range alone could result in an inaccurate depiction of the actual ordinary course of business because only 2 out of 22 payments before the preference period were for amounts greater than $40,213 (those made on October 4, 2000 and December 19, 2000, representing only 9.1% of the total payments).

In addition, Moltech made payments in "batches" (where multiple invoices are paid with one check) during the entire business relationship. 82% of the payments Moltech made before the preference period were in batches of three or less. Average batch size before the preference period was 2.95. Batch sizes ranged from 1–10 before the preference period. However, there was an unusually large batch of ten for the payment on October 4, 2000, which might be described as aberrational, as the next highest batch size was six.

■ The third factor is whether the debtor or creditor engaged in any unusual collection or payment activity. Moltech's invoices indicate that payment was due within 30 days. However, late payments are not necessarily outside of the ordinary course of business if paying late was historically part of the ordinary course of business that had developed between the parties before the preference period. *In re A.W. & Associates, Inc.*, 136 F.3d 1439, 1441–42 n. 7 (11th Cir.1998). Before the preference period, 82% of Moltech's pre-preference payments were made within 60 days of invoice. On average, Moltech paid the invoices within 47 days. The absolute range of Moltech's pre-preference payments was 26–109 days after invoice; however, two payments might be viewed as aberrational: the 5/30/00 payment, which was made 83 and 109 days after invoice, and the 12/8/00 payment, which was made 39 and 94 days after invoice. Thus, Moltech *generally* made payments between 30 and 76 days after invoice.

The fourth factor is the circumstances under which the payment was made. In this case there has been no argument that there were any special circumstances surrounding the challenged transactions. Some courts consider whether the creditor took advantage of debtor's deteriorating financial condition. *In re Furrs Supermarkets, Inc.*, 296 B.R. 33, 40–41 (Bankr. D.N.M.2003). In the 11th Circuit, however, the creditor's state of mind is immaterial in finding a preference. *In re Craig Oil Co.*, 785 F.2d 1563, 1566 (11th Cir.1986).

Having established the ordinary course of business between the parties, the transfers made during the preference period are compared for consistency. In this case, the timing and amount of payments are the primary indicators that the preference period payments were not made in the ordinary course of business.

The date of delivery of the check determines the relevant date for purposes of the ordinary course of business exception under § 547(c). *In re A.W. & Associates, Inc.,* 196 B.R. 900, 904 (Bankr. N.D.Fla.1996), *rev'd on other grounds* 136 F.3d 1439 (11th Cir.1998). Thus, the payment delivered on March 5, 2001 falls within the 90–day preference period, which began on February 21, 2001.

The March 5, 2001 payment was for a batch of 7 invoices, made 82–91 days after the invoices, for an amount of $49,178. At first glance, the March 5, 2001 payment seems to be within the absolute range of payment amounts ($90—$77,768). However, only two payments made during the preference period were for more than $40,214. *Cf. In re Speco,* 218 B.R. at 399; *Mossay v. Hallwood Petroluem, Inc.,* 1997 WL 222921 at *4 (N.D.Tx.1997). 86% of the pre-preference payments were for less than $25,000 (roughly half the amount of the challenged payment). *Cf. Lovett* 931 F.2d at 497–99. Furthermore, the average pre-preference payment amount was only $15,097, which is substantially lower than the March 5, 2001 payment (for $49,178). *See In re CCG 1355, Inc.,* 276 B.R. 377, 382, 384 (Bankr.D.N.J.2002). An accurate representation of the ordinary course of business leads me to conclude that the amount of the March 5, 2001 payment was substantially higher than what had been established as ordinary in the time before the preference period.

The March 5, 2001 payment was for invoices 82–91 days old, which is quite different from the pre-preference absolute range of 26–109 days on the low end (compare 26 to 82). In addition, Moltech *generally* paid invoices within 30–76 days; when this range is compared to the March 5, 2001 payment range of 82–91, it would seem to be outside of the ordinary course of business. *See Homes of Port Charlotte,*

109 B.R. at 490–91. In addition, the average number of days between invoice and payment increased substantially (from 47 to 86, a difference of 39). *See In re CCG 1355, Inc.,* 276 B.R. 377, 381–84 (Bankr. D.N.J.2002); *In re Molded Acoustical Products,* 18 F.3d at 228; *In re Homes of Port Charlotte,* 109 B.R. at 490–91; *In re National Enterprises,* 172 B.R. at 833. Further, only two payments took longer than 76 days before the preference period. *Cf. In re Speco,* 218 B.R. at 399. This is validated by the fact that only 18% of pre-preference payments took longer than 60 days. *See Lovett* 931 F.2d at 499; *In re CCG 1355,* 276 B.R. at 381–84 (Bankr. D.N.J.2002). Hence, the March 5, 2001 payment made 82–91 days after invoice took substantially longer than payments made before the preference period.

Furthermore, the change in batch size provides additional support for the conclusion that the March 5, 2001 payment was later and for a higher amount than what was ordinary before the preference period. Before the preference period, batch size ranged from 1–10; average batch size before the preference period was 2.95; 82% of the pre-preference payments were in batches of three or less. The batch size of the March 5, 2001 payment was seven. An increase in batch size of only one or two invoices standing alone is probably not enough to constitute "substantial deviation." *See In re Tennessee Chemical,* 112 F.3d 234, 238 (6th Cir.1997); *In re Speco,* 218 B.R. 390, 399–400 (Bankr.S.D.Ohio 1998). However, the increase in batch size of roughly four here provides additional evidence that the payments made during the preference period were not ordinary.

The March 5, 2001 payment took substantially longer than almost all of the payments made before the preference period began. In addition, the payment was for a substantially higher amount than al-

most all of the payments made before the preference period. Furthermore, the payment included a larger batch size than most of the pre-preference payments. In light of these facts, the March 5, 2001 payment substantially deviated from past conduct and, therefore, cannot be said to be in the ordinary course of business.

The March 22, 2001 payment was for a batch of eight invoices, made 56–70 days after the invoices, for an amount of $49,084. The payment amount of $49,084 substantially deviated from the ordinary course of business for the same reasons that the March 5, 2001 payment of $49,178 constituted substantial deviation from the ordinary course of business in terms of amount.

Whether the number of days between invoice and payment before the preference period substantially deviated from the March 22, 2001 payment presents a closer question. The March 22, 2001 payment was made 56–70 days after the date of invoices. When this range is compared to the range established before the preference period (26–109), it is apparent that the low ends of the ranges are not consistent (compare 26 with 56). In addition, only 5 of 22(23%) pre-preference payments took longer than 56 days. *See Lovett,* 931 F.2d at 499; *In re CCG 1355, Inc.,* 276 B.R. at 381–84; *Cf. In re Speco,* 218 B.R. at 399. Furthermore, the number of days between invoice and payment jumped from an average of 46.9 days before the preference period to an average of 63.9 days during the preference period, a 17–day difference. *See In re Molded Acoustical Products,* 18 F.3d at 228; *Lovett,* 931 F.2d at 497–99; *In re CCG 1355, Inc.,* 276 B.R. at 381–84. Thus, this payment was significantly later than ordinary payments had been before the preference period.

The increase in batch size of the March 22, 2001 provides additional evidence that the payment was not made in the ordinary course of business. Like the March 5, 2001 payment, the batch size of eight is markedly higher than the pre-preference batch size (an average of three). When viewed in context, the March 22, 2001 transfer cannot be said to be in the ordinary course of business. The payment amount substantially deviated from the ordinary course of business, and the number of days between invoice and payment together with the batch size increased substantially.

The April 9, 2001 payment is quite similar to the March 22, 2001 payment. The April payment was for a batch of seven invoices, made 61–70 days after invoice, in the amount of $50,061. Based on the analysis for the March 5 and March 22 payments, this payment is also outside of the ordinary course of business. After having concluded that the March 5, 2001 payment amount of $49,178 substantially deviated from the ordinary course of business, it follows that the April 9, 2001 payment of $50,063 is also too high to be considered within the ordinary course of business. The April 9, 2001 payment, made 61–70 days after the invoices, is later than the March 22, 2001 payment already found to have been a substantial deviation. In addition, the April payment took longer than the average 47 days that payment ordinarily took, and was outside of the 60 days within which 82% of payments had previously been made. Like the March 5, 2001 payment, the batch size of seven for the April 9, 2001 payment is higher than the pre-preference batch sizes.

The factors in this case indicate that all three payments were not in the ordinary course of business. Some courts have said that only one inconsistent factor is enough to take a transfer out of the ordinary course of business. *In re Laclede Steel Co.,* 271 B.R. 127, 131–32 (8th Cir. BAP

2002). Here, more than one factor has been found to be extraordinary. The conclusion that the payments were not in the ordinary course of business in this case is compelled by the factors when they are viewed together. The payments were for a higher amount, took longer, and were for a larger batch size than the payments made during the preference period. Viewed in context and compared with the ordinary course of business that developed between the parties in its entirety, the factors indicate that the preference period payments substantially deviated from the ordinary course of business.

Finally, Tooh Dineh has argued that it had an evolving business relationship with Moltech, and therefore the preference period payments were made in the ordinary course of business as it was evolving between the parties. Obviously, the parties' relationship may evolve, but such evolution causes analytical problems in determining what the ordinary course of business actually was. There must be an established course of business to which the court can compare the transactions during the preference period. While the parties are certainly free to adjust the terms of their business relationship over time, they cannot "evolve" their course of business into a series of voidable preferences. In this case, evaluation of the course of dealings between the parties does not reveal that the characteristics of the payments just preceding the preference period changed enough to be considered "evolving."

## CONCLUSION

For the reasons articulated above, I find that there are no genuine issues of material fact in this case. Tooh Dineh has not met its burden of proving that the payments it received from debtor Moltech during the preference period were made within in the ordinary course of business. The payments made during the preference period substantially deviated from the ordinary course of business which had developed between the parties before the preference period in terms of amount, timing, and batch size.

Finding that the challenged payments were not made in the ordinary course of business under the subjective prong of § 547(c)(2)(B) is dispositive in this case. Therefore, it is unnecessary to determine whether the challenged transfers were ordinary according to industry standards under the objective prong of § 547(c)(2)(C). *See In re A.W. & Associates, Inc.*, 136 F.3d at 1442. As a matter of law, the $82,474.00 preferential transfer at issue is not subject to the ordinary course of business defense found in 11 U.S.C. § 547(c)(2). Therefore, the transfer may be avoided. Accordingly, it is hereby

ORDERED and ADJUDGED that the Plaintiff's Motion for Summary Judgment is GRANTED.

## APPENDIX
### TOOH DINEH INDUSTRIES, INCORPORATED
ACCOUNTS RECEIVABLE AGING FOR MOLTECH POWER SYSTEMS, INC.

| Days Payment Received | Date | Typ Reference | | | Balance Due |
|---|---|---|---|---|---|
| 42 | 8/13/99 | INV 1848 | $ | 7,900.00 | $ - |
| | 9/24/99 | PMT 073606 | $ | (7,900.00) | |
| 56 | 11/8/99 | INV 2693 | $ | 27.65 | $ - |
| | 1/3/00 | PMT 1700001880 | $ | (27.65) | |

| | | | | | |
|---|---|---|---|---|---|
| 52 | 11/12/99 | INV 2742 | $ | 662.04 | $ — |
| | 1/3/00 | PMT 1700001630 | $ | (662.04) | |
| 47 | 11/17/99 | INV 2816 | $ | 35.60 | $ — |
| | 1/3/00 | PMT 1700001880 | $ | (35.60) | |
| 47 | 11/17/99 | INV 2818 | $ | 3.24 | $ — |
| | 1/3/00 | PMT 1700001880 | $ | (3.24) | |
| 46 | 11/18/99 | INV 2826 | $ | 191.76 | $ — |
| | 1/3/00 | PMT 1700001880 | $ | (191.76) | |
| 40 | 11/24/99 | INV 2847 | $ | 1,176.96 | $ — |
| | 1/3/00 | PMT 1700002042 | $ | (1,176.96) | |
| 38 | 12/3/99 | INV 2938 | $ | 87.37 | $ — |
| | 1/10/00 | PMT 1700002187 | $ | (87.37) | |
| 76 | 12/8/99 | INV 2983 | $ | 1,262.42 | $ — |
| | 2/22/00 | PMT 1700003377 | $ | (1,262.42) | |
| | 1/25/00 | INV 1025 | $ | 7,900.00 | $ — |
| | 4/20/00 | ADJ 143 | $ | (7,900.00) | |
| 28 | 1/25/00 | INV 3456 | $ | 6.47 | $ — |
| | 2/22/00 | PMT 1700003377 | $ | (6.47) | |
| 109 | 2/11/00 | INV 3699 | $ | 16,818.74 | $ — |
| | 5/30/00 | PMT 1700006633 | $ | (16,818.74) | |
| 33 | 3/8/00 | INV 4048 | $ | 5,519.85 | $ — |
| | 4/10/00 | PMT 1700004981 | $ | (5,519.85) | |
| 83 | 3/8/00 | INV 4061 | $ | 5,369.65 | $ — |
| | 5/30/00 | PMT 1700006633 | $ | (5,369.65) | |
| 33 | 3/8/00 | INV 4078 | $ | 1,000.00 | $ — |
| | 4/10/00 | PMT 1700004981 | $ | (1,000.00) | |
| 34 | 3/14/00 | INV 4109 | $ | 300.40 | $ — |
| | 4/17/00 | PMT 1700005212 | $ | (300.40) | |
| 61 | 4/19/00 | INV 4705 | $ | 64.72 | $ — |
| | 6/19/00 | PMT 1700000205 | $ | (64.72) | |
| 33 | 5/3/00 | INV 4885 | $ | 2,346.88 | $ — |
| | 6/5/00 | PMT 1700006877 | $ | (2,346.88) | |
| 46 | 5/4/00 | INV 4899 | $ | 582.48 | $ — |
| | 6/19/00 | PMT 1700000205 | $ | (582.48) | |
| 32 | 5/4/00 | INV 4900 | $ | 3,154.20 | $ — |
| | 6/5/00 | PMT 1700006877 | $ | (3,154.20) | |
| 31 | 5/5/00 | INV 4908 | $ | 11,039.70 | $ — |
| | 6/5/00 | PMT 1700006877 | $ | (11,039.70) | |
| 34 | 5/9/00 | INV 4925 | $ | 5,144.35 | $ — |
| | 6/12/00 | PMT 1700007066 | $ | (5,144.35) | |
| 17 | 5/30/00 | SN# 11471 | $ | 8,871.16 | |
| | 6/19/00 | CSH 0700000205 | $ | (8,871.16) | |
| 4 | 6/15/00 | CR539 | $ | (8,871.16) | |
| | 6/19/00 | CSH 0700000205 | $ | 8,871.16 | |
| 42 | 6/19/00 | INV 5464 | $ | 3,811.33 | $ — |
| | 7/31/00 | PMT 1700001343 | $ | (3,811.33) | |
| 40 | 7/5/00 | INV 5744 | $ | 5,519 85 | $ — |
| | 8/14/00 | PMT 1700001790 | $ | (5,519.85) | |
| 39 | 7/6/00 | INV 5769 | $ | 3,661.13 | $ — |
| | 8/14/00 | PMT 1700001790 | $ | (3,661.13) | |
| 38 | 7/7/00 | INV 5786 | $ | 5,763.93 | $ — |
| | 8/14/00 | PMT 1700001790 | $ | (5,763.93) | |
| 41 | 7/14/00 | INV 5853 | $ | 4,693.75 | $ — |
| | 8/24/00 | PMT 1700002033 | $ | (4,693.75) | |
| 42 | 7/17/00 | INV 5876 | $ | 5,388.43 | $ — |
| | 8/28/00 | PMT 1700002331 | $ | (5,388.43) | |
| 40 | 7/19/00 | INV 5899 | $ | 5,519.85 | $ — |
| | 8/28/00 | PMT 1700002331 | $ | (5,519.85) | |
| 39 | 7/20/00 | INV 5917 | $ | 9,312.40 | $ — |

| | | | | |
|---|---|---|---|---|
| | 8/28/00 | PMT 1700002331 | $ (9,312.40) | |
| 65 | 7/31/00 | INV 6045 | $ 24,712.17 | $ - |
| | 10/4/00 | PMT 00031797 | $ (24,712.17) | |
| 63 | 8/2/00 | INV 6115 | $ 7,096.95 | $ - |
| | 10/4/00 | PMT 00031797 | $ (7,096.95) | |
| 63 | 8/2/00 | INV 6117 | $ 4,103.40 | $ - |
| | 10/4/00 | PMT 00031797 | $ (4,103.40) | |
| 62 | 8/3/00 | INV 6138 | $ 5,744.76 | $ - |
| | 10/4/00 | PMT 00031797 | $ (5,744.76) | |
| 61 | 8/4/00 | INV 6146 | $ 11,489.52 | $ - |
| | 10/4/00 | PMT 00031797 | $ (11,489.52) | |
| 58 | 8/7/00 | INV 6172 | $ 5,744.76 | $ - |
| | 10/4/00 | PMT 00031797 | $ (5,744.76) | |
| 57 | 8/8/00 | INV 6188 | $ 5,744.76 | $ - |
| | 10/4/00 | PMT 00031797 | $ (5,744.76) | |
| 56 | 8/9/00 | INV 6208 | $ 5,744.76 | $ - |
| | 10/4/00 | PMT 00031797 | $ (5,744.76) | |
| 51 | 8/14/00 | INV 6266 | $ 1,641.36 | $ - |
| | 10/4/00 | PMT 00031797 | $ (1,641.36) | |
| 81 | 8/14/00 | SN11622 | $ (34.47) | $ - |
| | 11/3/00 | CSH 1700000899 | $ 34.47 | |
| −1 | 8/15/00 | CR623 | $ (410.19) | $ — |
| | 8/14/00 | CSH 1700001790 | $ 410.19 | |
| −1 | 8/15/00 | CR624 | $ (2,110.32) | $ — |
| | 8/14/00 | CSH 1700001790 | $ 2,110.32 | |
| 94 | 9/5/00 | INV 6596 | $ 351.72 | $ - |
| | 12/8/00 | PMT 1700001707 | $ (351.72) | |
| 94 | 9/5/00 | INV 6597 | $ 1,328.72 | $ - |
| | 12/8/00 | PMT 1700001707 | $ (1,328.72) | |
| 27 | 9/7/00 | INV 6639 | $ 5,744.76 | $ - |
| | 10/4/00 | PMT 00031797 | $ (5,744.76) | |
| 42 | 9/8/00 | INV 6663 | $ 5,744.76 | $ - |
| | 10/20/00 | PMT 1700000353 | $ (5,744.76) | |
| 39 | 9/11/00 | INV 6677 | $ 6,584.98 | $ - |
| | 10/20/00 | PMT 1700000353 | $ (6,584.98) | |
| 37 | 9/13/00 | INV 6709 | $ 4,474.86 | $ - |
| | 10/20/00 | PMT 1700000353 | $ (4,474.86) | |
| 36 | 9/14/00 | INV 6737 | $ 2,900.00 | $ - |
| | 10/20/00 | PMT 1700000353 | $ (2,900.00) | |
| 40 | 9/20/00 | INV 6791 | $ 2,071.24 | $ - |
| | 10/30/00 | PMT 1700000640 | $ (2,071.24) | |
| 26 | 10/4/00 | INV 6980 | $ 5,744.76 | $ - |
| | 10/30/00 | PMT 1700000640 | $ (5,744.76) | |
| 26 | 10/4/00 | INV 6996 | $ 11,489.52 | $ - |
| | 10/30/00 | PMT 1700000640 | $ (11,489.52) | |
| 38 | 10/10/00 | INV 7067 | $ 5,744.76 | $ - |
| | 11/17/00 | PMT 1700001350 | $ (5,744.76) | |
| 38 | 10/10/00 | INV 7076 | $ 359.00 | $ - |
| | 11/17/00 | PMT 1700001350 | $ (359.00) | |
| 42 | 10/23/00 | INV 7321 | $ 11,489.52 | $ - |
| | 12/4/00 | PMT 1700001424 | $ (11,489.52) | |
| 41 | 10/24/00 | INV 7358 | $ 11,489.52 | $ - |
| | 12/4/00 | PMT 1700001424 | $ (11,489.52) | |
| 38 | 10/27/00 | INV 7415 | $ 17,234.28 | $ - |
| | 12/4/00 | PMT 1700001425 | $ (17,234.28) | |
| 50 | 10/30/00 | INV 7426 | $ 22,979.04 | $ - |
| | 12/19/00 | PMT 1700002045 | $ (22,979.04) | |
| 48 | 11/1/00 | INV 7482 | $ 7,698.76 | $ - |
| | 12/19/00 | PMT 1700002045 | $ (7,698.76) | |

| | | | | |
|---|---|---|---|---|
| 46 | 11/3/00 | INV 7528 | $ 17,234.28 | $ - |
| | 12/19/00 | PMT 1700002045 | $ (17,234.28) | |
| 43 | 11/6/00 | INV 7565 | $ 5,744.76 | $ - |
| | 12/19/00 | PMT 1700002045 | $ (5,744.76) | |
| 43 | 11/20/00 | INV 7758 | $ 416.73 | $ - |
| | 1/2/01 | PMT 1700002388 | $ (416.73) | |
| 39 | 10/30/00 | CSH SN# 12064 | $ 4,220.64 | $ - |
| | 12/8/00 | CM CR755 | $ (4,220.64) | |
| 36 | 11/27/00 | INV 7819 | $ 3,360.88 | $ - |
| | 1/2/01 | PMT 1700002388 | $ (3,360.88) | |
| 34 | 11/29/00 | INV 7846 | $ 3,566.73 | $ - |
| | 1/2/01 | PMT 1700002388 | $ (3,566.73) | |
| 91 | 12/4/00 | INV 7911 | $ 771.85 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (771.85) | |
| 89 | 12/6/00 | INV 7963 | $ 22,979.04 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (22,979.04) | |
| 88 | 12/7/00 | INV 7970 | $ 11,489.52 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (11,489.52) | |
| 87 | 12/8/00 | INV 8005 | $ 5,744.76 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (5,744.76) | |
| 84 | 12/11/00 | INV 8030 | $ 161.55 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (161.55) | |
| 84 | 12/11/00 | INV 8031 | $ 4,865.46 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (4,865.46) | |
| 82 | 12/13/00 | INV 8071 | $ 3,165.48 | $ - |
| | 3/5/01 | PMT 1700002860 | $ (3,165.48) | |
| 70 | 1/11/01 | INV 8268 | $ 5,744.76 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (5,744.76) | |
| 70 | 1/11/01 | INV 8271 | $ 234.48 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (234.48) | |
| 69 | 1/12/01 | INV 8276 | $ 5,744.76 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (5,744.76) | |
| 64 | 1/17/01 | INV 8300 | $ 8,206.80 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (8,206.80) | |
| 63 | 1/18/01 | INV 8323 | $ 8,206.80 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (8,206.80) | |
| 62 | 1/19/01 | INV 8334 | $ 8,206.80 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (8,206.80) | |
| 57 | 1/24/01 | INV 8368 | $ 8,206.80 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (8,206.80) | |
| 56 | 1/25/01 | INV 8375 | $ 4,533.28 | $ - |
| | 3/22/01 | PMT 1700003717 | $ (4,533.28) | |
| 70 | 1/29/01 | INV 8424 | $ 8,206.80 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (8,206.80) | |
| 70 | 1/29/01 | INV 8425 | $ 820.68 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (820.68) | |
| 69 | 1/30/01 | INV 8432 | $ 8,206.80 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (8,206.80) | |
| 67 | 2/1/01 | INV 8458 | $ 8,206.80 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (8,206.80) | |
| 63 | 2/5/01 | INV 8470 | $ 8,206.80 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (8,206.80) | |
| 62 | 2/6/01 | INV 8478 | $ 8,206.80 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (8,206.80) | |
| 61 | 2/7/01 | INV 8498 | $ 8,206.80 | $ - |
| | 4/9/01 | PMT 1700003914 | $ (8,206.80) | |
| | 2/9/01 | INV 8522 | $ 16,413.60 | $ 16,413.60 |
| | 2/9/01 | INV 8524 | $ 3,399.96 | $ 3,399.96 |
| | 2/12/01 | INV 8535 | $ 8,206.80 | $ 8,206.80 |

| Date | Invoice | Amount | Amount |
|---|---|---|---|
| 2/13/01 | INV 8545 | $ 16,413.60 | $ 16,413.60 |
| 2/14/01 | INV 8564 | $ 8,206.80 | $ 8,206.80 |
| 2/16/01 | INV 8576 | $ 8,206.80 | $ 8,206.80 |
| 2/19/01 | INV 8595 | $ 8,206.80 | $ 8,206.80 |
| 2/20/01 | INV 8612 | $ 8,206.80 | $ 8,206.80 |
| 2/21/01 | INV 8625 | $ 8,206.80 | $ 8,206.80 |
| 2/21/01 | INV 8640 | $ 2,147.58 | $ 2,147.58 |
| 2/27/01 | INV 8714 | $ 3,497.66 | $ 3,497.66 |
| 3/23/01 | INV 8931 | $ 5,744.76 | $ 5,744.76 |
| 3/26/01 | INV 8958 | $ 5,744.76 | $ 5,744.76 |
| 3/27/01 | INV 8960 | $ 5,744.76 | $ 5,744.76 |
| 4/10/01 | INV 9092 | $ 3,243.64 | $ 3,243.64 |
| 4/10/01 | INV 9093 | $ 12,486.06 | $ 12,486.06 |
| 4/16/01 | INV 9132 | $ 21,200.90 | $ 21,200.90 |
| 4/16/01 | INV 9144 | $ 11,489.52 | $ 11,489 52 |
| 4/25/01 | INV 9211 | $ 195.40 | $ 195.40 |
| BALANCE DUE | | $ 156,963.00 | $ 156,963.00 |